**Exhibit A:**

**Notice of Intent to Bring Suit Against Administrator Jackson for Failure to Grant or Deny Environmental Integrity Project and Environment Maryland Petition to Object to Luke Paper Company's Title V Permit for Operation of the Luke Paper Company Kraft Pulp and Paper Mill (Permit No. 24-001-00011)**

**September 10, 2009**



1920 L Street NW, Suite 800
Washington, DC  20036
p: 202-296-8800 f: 202-296-8822
www.environmentalintegrity.org

September 10, 2009

*VIA CERTIFIED MAIL*
Ms. Lisa P. Jackson
Administrator
U.S. Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, NW
Washington, DC 20406

RE:    *Notice of Intent to Bring Suit Against Administrator Jackson for Failure to Grant or Deny Petition to Object to NewPage Corporation's Title V Permit, for Operation of the Luke Paper Company Kraft Pulp and Paper Mill, a Nondiscretionary Duty Under 42 U.S.C. § 7661d(b)(2)*

Dear Administrator Jackson,

I am writing on behalf of the Environmental Integrity Project ("EIP") and Environment Maryland ("Plaintiffs") to provide you with notice of intent to bring suit against the Administrator of the U.S. Environmental Protection Agency ("EPA") for failing to perform a nondiscretionary duty.

As explained more fully below, EPA failed to grant or deny Plaintiffs' petition objecting to Title V federal operating Permit Number 24-001-00011 issued to Luke Paper Company, a wholly owned subsidiary of NewPage Corporation, on January 22, 2009. The petition was timely filed on February 27, 2009, and was amended on June 19, 2009. The Administrator's failure to act on Plaintiff's petition is a violation of 42 U.S.C. § 7661d(b)(2), which requires the Administrator to grant or deny such petitions within 60 days after the petition is filed.

## Authority to Bring Suit

Clean Air Act section 304(a)(2) authorizes citizen suits "against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator." 42 U.S.C. § 7604(a)(2). The Administrator has a nondiscretionary duty to grant or deny petitions filed by citizens that object to the issuance of a federal operating permit on the basis that it contains provisions not in compliance with the Clean Air Act. 42 U.S.C. § 7661d(b). In the event that the Administrator fails to perform this nondiscretionary duty, citizens may bring suit to compel such action. The district courts have jurisdiction over these suits. 42 U.S.C. § 7604(a); *New York Public Interest Research Group, Inc. v. Whitman*, 214 F.Supp. 2d 1, 3 (2002).

The Clean Air Act requires citizens to give the Administrator 60 days notice before bringing an action under section 304(a)(2). 42 U.S.C. § 7604(b)(2). Plaintiffs are hereby giving

100% PCW

Administrator Jackson notice of their intent to file suit against her, in her official capacity as Administrator of the EPA, under Clean Air Act section 304(a)(2) for failing to perform a nondiscretionary duty. Plaintiffs have the authority to commence this suit at any time 60 days after the Administrator has received this notice.

## EPA's Failure to Perform a Nondiscretionary Duty

During the Maryland Department of the Environment ("MDE") review of Luke Paper Company's Title V Federal Operating Permit for the pulp and paper mill ("Luke Paper Permit"), Plaintiffs submitted written comments to MDE during the initial public notice and comment period on August 17, 2007. Plaintiffs' comments articulated specific objections to provisions in the draft Luke Paper Permit: (1) failure to include required compliance assurance monitoring (CAM) methods, (2) failure to include sufficient monitoring for particulate matter emitted by industrial boilers, (3) substitution of a more lenient sulfur dioxide emission standard for two power boilers, (4) failure to include specific emission standards for hazardous air pollutants ("HAPs") for industrial boilers, and (5) inconsistent reporting of HAPs emissions.

MDE issued a final Title V Permit for Luke Paper Company facility on January 22, 2009,[1] and EPA did not object to the final Permit issued by MDE. Plaintiffs note that the final Permit was issued in violation of 40 C.F.R. §§ 70.7(a)(1)(ii), (h)(1); Md. Code Ann. § 26.11.03.07(B)(2), which requires that Maryland Department of the Environment ("MDE") notify all interested parties of the opportunity to comment on any proposed Title V Permit. Petitioners filed timely comments on August 17, 2007, in response to a draft Permit issued that year. On May 12, 2008, in response to our inquiries, we were informed via email that a revised draft Permit for Luke Paper would be issued shortly and that Petitioners would be notified as required by Maryland regulations and provided with an opportunity to comment. Petitioners were never notified of the availability of a draft Permit or that a comment period had commenced, and only learned that a final Permit had been issued after repeated inquiries of both MDE and EPA.

We are aware that a petition must be filed within 60 days after EPA's 45-day review period ends. As explained in our letter of February 23, 2009 to Judy Katz, EPA and MDE have adopted various and conflicting policies to indicate when EPA's review period begins, making it difficult to determine when a petition may be filed in a timely manner. While these policies are confusing and change from permit to permit, one thing is clear: at the very earliest, a petition may not be filed until at least 46 days after MDE has issued a draft permit. In the present case, Plaintiffs never received notice that a revised draft Permit was issued, or that a new comment period began.

When the Administrator does not object to a permit containing provisions that are not in compliance with the Clean Air Act, citizens may petition the Administrator to object. 42 U.S.C. § 7661d(b)(2). The Administrator must respond within 60 days after such a petition is filed by either granting or denying the petition. 42 U.S.C. § 7661d(b)(2). The language of the statute states: "[t]he Administrator *shall* grant or deny such petition within 60 days after the petition is

---

[1] Telephone conversation with Paul Arnold, EPA Region III, Permits and Technical Assessment Branch, In Philadelphia, Pa. (Feb. 17, 2009).

filed." 42 U.S.C. § 7661d(b)(2). This is clearly a nondiscretionary duty. *New York Public Interest Research Group*, 214 F.Supp. 2d. at 1-3.

Plaintiffs filed a Petition for Objection to the Luke Paper Permit ("Petition") as soon as Plaintiffs became aware that MDE had issued a final permit on February 27, 2009, and amended the Petition on June 19, 2009. App. A (Notice of Partial Withdrawal of Petition and Petition for Objection dated February 27, 2009). The final Permit is not in compliance with the Clean Air Act because the Permit (1) does not contain emissions monitoring sufficient to ensure compliance with emission standards, as required by 42 U.S.C. § 7661c(c) and the D.C. Circuit's decision in *Sierra Club v. EPA*, 536 F.3d 673 (D.C. Cir. 2008), does not include CAM methods required by 40 C.F.R. § 64 et seq., and (3) does not include specific emission standards for HAPs from Luke Paper's industrial boilers, as required by 112(j) and Title V of the Clean Air Act.[2]

EPA granted the Plaintiff's request to consider the petition, dated February 27, 2009, objecting to the issuance of the final Title V operating permit for the NewPage Corporation facility located in Luke, Maryland. See App. B (EPA's letter to Jennifer Peterson regarding EPA's review of Plaintiff's objection to issuance of a Title V operating permit (March 20, 2009)). The EPA had 60 days to consider the Plaintiff's petition and respond.

The Administrator has not yet granted or denied the petition. Therefore, the Administrator has failed to perform the nondiscretionary duty to grant or deny Plaintiffs petition and is in violation of 42 U.S.C. § 7661d(b)(2).

## Relief Requested

Plaintiffs intend to file suit 60 days after the Administrator receives this notice to compel the Administrator to perform her nondiscretionary duty to grant or deny Plaintiffs' petition. Plaintiffs will seek the following relief:

1. An order compelling Administrator Jackson to grant or deny Plaintiff's petition within 60 days from the date of the order;
2. Attorney's fees and other litigation costs; and
3. Other appropriate relief as allowed.

---

[2] Plaintiffs filed a partial withdrawal of the Petition for Objection on June 19, 2009, which withdrew our request for EPA to object to the Luke Paper Permit on the sole issue of the inclusion of an exemption of emissions of HAPs from certain industrial processes during startup, shutdown, and malfunction ("SSM") events, in violation of the D.C. Circuit's vacatur of the section 112 SSM exemption on December 19, 2008.

If you have any questions regarding the allegations in this notice, believe any of the foregoing information to be in error, wish to discuss the exchange of information, or would otherwise like to discuss a settlement of this matter prior to the initiation of litigation, please contact us at the address below.

Respectfully Submitted,

*Jennifer Peterson*

Jennifer Peterson
ENVIRONMENTAL INTEGRITY PROJECT
1920 L Street NW, Suite 800
Washington, DC 20036
(202) 263-4449
(202) 296-8822 FAX
jpeterson@environmentalintegrity.org

*CC Via Certified Mail:*

Eric H. Holder Jr., U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Ave NW
Washington, DC  20530-0001

William C. Early, Acting Regional Administrator
U.S. EPA Region 3
1650 Arch Street
Mail Code 3RA00
Philadelphia, PA  19103-2029

Diana Esher, Acting Director
Air Protection Division
U.S. EPA Region 3
1650 Arch Street
Mail Code 3AP00
Philadelphia, PA  19103-2029

Shari Wilson, Secretary
Maryland Department of the Environment
1800 Washington Blvd
Baltimore, MD  21230

George (Tad) Aburn, Director
Air & Radiation Management Administration
Maryland Department of the Environment
1800 Washington Blvd
Baltimore, MD  21230

Appendix A

Notice of Partial Withdrawal of Petition for Objection to the Title V Federal
Operating Permit Issued to Luke Paper Company, a Subsidiary of New Page Corporation
(Permit No. 24-001-00011)
(June 19, 2009)


and


Petition for Objection to the Title V Federal Operating Permit Issued to Luke Paper
Company, a Subsidiary of New Page Corporation (Permit No. 24-001-00011)
(Feb. 27, 2009)



ENVIRONMENTAL
INTEGRITY PROJECT

1920 L Street NW, Suite 800
Washington, DC 20036
p: 202-296-8800 f: 202-296-8822
www.environmentalintegrity.org

June 19, 2009

*VIA CERTIFIED MAIL*
Administrator Lisa P. Jackson
U.S. Environmental Protection Agency
Ariel Rios Building, Mail Code 1101A
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

**Re:    Notice of Partial Withdrawal of Petition for Objection to NewPage Corporation's
Title V Permit Number 24-001-00011, for Operation of Luke Paper Company, 300
Pratt Street, Luke, MD 21540**

Dear Administrator Jackson:

I write on behalf of the Environmental Integrity Project and Environment Maryland
("Petitioners") who hereby partially withdraw a petition they filed on February 27, 2009 pursuant
to section 505(b)(2) of the Clean Air Act requesting that the U.S. Environmental Protection
Agency ("EPA") object to the Title V federal operating Permit issued to Luke Paper Company, a
subsidiary of New Page Corporation ("Petition"). Petitioners are filing this Notice of Partial
Withdrawal with the EPA Administrator, with copies to the Maryland Department of the
Environment ("MDE"), NewPage Corporation, the parent company of Luke Paper Company,
and the EPA Region III Air Permit Section Chief.

Specifically, Petitioners withdraw our request for EPA to object to the Luke Paper Title
V Permit on the sole issue of the inclusion of an exemption of emissions of hazardous air
pollutants from certain industrial processes during startup, shutdown, and malfunction ("SSM")
events, in violation of the D.C. Circuit's vacatur of the section 112 SSM exemption on December
19, 2008. See section IV of the attached Petition.

Petitioners maintain that the Luke Paper Title V Permit is not in compliance with the
Clean Air Act ("CAA"). As addressed in detail in our Petition dated February 27, 2009, the
Permit:

- Does not contain emissions monitoring sufficient to ensure compliance with emission
  standards, as required by 42 U.S.C. §7661c(c) and the D.C. Circuit's decision in *Sierra
  Club v. EPA*, 536 F.3d 673 (D.C. Cir. 2008);

- Does not comply with the compliance assurance monitoring (CAM) provisions of 40
  C.F.R. §64 et seq.; and

1

100% PCW

- Does not include specific emission standards for hazardous air pollutants from Luke Paper Company's industrial boilers, as required by 112(j) and Title V of the CAA.

We note that EPA is required to respond to the Petition we filed within 60 days. 42 U.S.C. § 7661d(b)(2). We hope that our partial withdrawal of the Petition will expedite EPA's review and response. Thank you for your prompt attention to our request.

Sincerely,

*Jennifer Peterson*

Jennifer Peterson
Attorney
ENVIRONMENTAL INTEGRITY PROJECT
1920 L Street NW, Suite 800
Washington, DC 20036
(202) 263-4449
(202) 296-8822 FAX
jpeterson@environmentalintegrity.org

*On behalf of Environmental Integrity Project and Environment Maryland*

cc (certified mail):

George (Tad) Aburn, Director
Air & Radiation Management Administration
Maryland Department of the Environment
1800 Washington Boulevard
Baltimore, MD 21230

Mark A. Suwyn
Chairman & Chief Executive Officer
NewPage Corporation
8540 Gander Creek Drive
Miamisburg, OH 45342

Resident Agent for Luke Paper Company
The Corporation Trust Incorporated
300 E. Lombard Street
Baltimore, MD 21202

Plant Manager
Luke Paper Company
300 Pratt Street
Luke, MD 21540

U.S. Environmental Protection Agency
Attn: Air Permit Section Chief, Region III
1650 Arch Street (3AP00)
Philadelphia, PA 19103-2029

2

Attachment A


PETITION FOR OBJECTION TO THE TITLE V FEDERAL OPERATIN PERMIT
ISSUED TO LUKE PAPER COMPANY, A SUBSIDIARY OF NEW PAGE
CORPORATION
(Permit Number 24-001-00011)

Submitted By:
THE ENVIRONMENTAL INTEGRITY PROJECT AND ENVIRONMENT MARYLAND


February 27, 2009

4



ENVIRONMENTAL
INTEGRITY PROJECT

1920 L Street NW, Suite 800
Washington, DC 20036
p: 202-296-8800 f: 202-296-8822
www.environmentalintegrity.org

February 27, 2009

*VIA FACSIMILE AND CERTIFIED MAIL*
Administrator Lisa P. Jackson
U.S. Environmental Protection Agency
Ariel Rios Building, Mail Code 1101A
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460
Fax Number: (202) 501-1450

**Re:    Petition for objection to NewPage Corporation's Title V Permit Number 24-001-00011, for operation of Luke Paper Company, 300 Pratt Street, Luke, MD 21540**

Dear Administrator Jackson:

Enclosed is a petition requesting that the U.S. Environmental Protection Agency object to the Title V federal operating Permit issued to Luke Paper Company, a subsidiary of New Page Corporation. This petition is submitted by the Environmental Integrity Project and Environment Maryland ("Petitioners") pursuant to Section 505(b)(2) of the Clean Air Act, 42 U.S.C. Section 505(b)(2) of the Clean Air Act, 42 U.S.C. Section 7661d(b)(2), 40 C.F.R. 70.8(d). As required by these provisions, Petitioners are filing this Petition with the EPA Administrator, with copies to the Maryland Department of the Environment ("MDE"), NewPage Corporation, the parent company of Luke Paper Company, and the EPA Region III Air Permit Section Chief.

As addressed in detail in the Petition, the Luke Paper Title V Permit is not in compliance with the Clean Air Act ("CAA"). Specifically, the Permit:

- Does not contain emissions monitoring sufficient to ensure compliance with emission standards, as required by 42 U.S.C. §7661c(c) and the D.C. Circuit's decision in *Sierra Club v. EPA*, 536 F.3d 673 (D.C. Cir. 2008);

- Does not comply with the compliance assurance monitoring (CAM) provisions of 40 C.F.R. §64 et seq.;

- Does not include specific emission standards for hazardous air pollutants from Luke Paper Company's industrial boilers, as required by 112(j) and Title V of the Clean Air Act; and

1

100% PCW

- Exempts emissions of hazardous air pollutants from certain industrial processes during startup, shutdown, and malfunction (SSM) events, in violation of the D.C. Circuit's vacatur of the section 112 SSM exemption on December 19, 2008.

Petitioners also note that the final Permit was issued in violation of 40 C.F.R. §§ 70.7(a)(1)(ii), (h)(1); Md. Code Ann. § 26.11.03.07(B)(2), which requires MDE to notify all interested parties of the opportunity to comment on any proposed Title V Permit. Petitioners filed timely comments on August 17, 2007, in response to a draft Permit issued that year. On May 12, 2008, in response to our inquiries, we were informed via email that a revised draft Permit for Luke Paper would be issued shortly and that Petitioners would be notified as required by Maryland regulations and provided with an opportunity to comment. Petitioners were never notified of the availability of a draft Permit or that a comment period had commenced, and only learned that a final Permit had been issued after repeated inquiries of both MDE and EPA.

We are aware that a petition must be filed within 60 days after EPA's 45-day review period ends. As explained in our letter of February 23, 2009 to Judy Katz, EPA and MDE have adopted various and conflicting policies to indicate when EPA's review period begins, making it difficult to determine when a petition may be filed in a timely manner. See App.C (Petitioners letter to EPA regarding notice and comment irregularities (February 23, 2009)). While these policies are confusing and change from permit to permit, one thing is clear: at the very earliest, a petition may not be filed until at least 46 days after MDE has issued a draft permit. In the present case, Petitioners never received notice that a revised draft Permit was issued, or that a new comment period began.

Given these procedural irregularities, we respectfully request that EPA treat this petition as filed in a timely manner, consider our objections to the final Permit, and provide a response within 60 days. Alternatively, we ask that MDE be required to republish the revised draft Permit, consider any comments filed by Petitioners, and issue a final Permit for review within 30 days.

We have no interest in delaying further action on the Luke Paper Title V Permit, which is now long overdue. But it would clearly be unfair to deny Petitioners the opportunity to exercise their rights to request EPA to object to the Permit, because of MDE's failure to follow the notification procedures required under federal law. See *Sierra Club v. Johnson*, 436 F.3d 1269 (11th Cir. 2006) (holding that EPA was obligated to object to a proposed Title V permit, where state agency approved permit without first creating mailing list and giving notice to persons on list, as required under Act's implementing regulations).

2

Thank you for your prompt attention to this request.

Sincerely,

*Jennifer Peterson*

Jennifer Peterson
Attorney
ENVIRONMENTAL INTEGRITY PROJECT
1920 L Street NW, Suite 800
Washington, DC 20036
(202) 263-4449
(202) 296-8822 FAX
jpeterson@environmentalintegrity.org

*On behalf of Environmental Integrity
Project and Environment Maryland*

cc (facsimile and certified mail):

George (Tad) Aburn, Director
Air & Radiation Management Administration
Maryland Department of the Environment
1800 Washington Boulevard
Baltimore, MD 21230
Fax Number: (410) 537-3202

Mark A. Suwyn
Chairman & Chief Executive Officer
NewPage Corporation
8540 Gander Creek Drive
Miamisburg, OH 45342
Fax Number: (937) 242-9324

Resident Agent for Luke Paper Company
The Corporation Trust Incorporated
300 E. Lombard Street
Baltimore, MD 21202

Plant Manager
Luke Paper Company
300 Pratt Street
Luke, MD 21540
Fax Number: (301) 359-2088

U.S. Environmental Protection Agency
Attn: Air Permit Section Chief, Region III
1650 Arch Street (3AP00)
Philadelphia, PA 19103-2029
Fax Number: (215) 814-2124

3

UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY

BEFORE THE ADMINISTRATOR

| | | |
|---|---|---|
| IN THE MATTER OF | ) | PETITION FOR OBJECTION |
| | ) | |
| Proposed Clean Air Act Title V | ) | Permit Number 24-001-00011 |
| Operating Permit Issued to Luke Paper | ) | |
| Company, a Subsidiary of NewPage | ) | |
| Corporation. | ) | |

Pursuant to section 505(b)(2) of the Clean Air Act ("CAA" or "Act"), 42 U.S.C. §

7661d(b)(2), and 40 C.F.R. §70.8(d), the Environmental Integrity Project and Environment

Maryland ("Petitioners") petition the Administrator of the U.S. Environmental Protection

Agency to object to the proposed Title V Operating Permit Number 24-001-00011 issued by the

Maryland Department of the Environment ("MDE") to Luke Paper Company, a wholly owned

subsidiary of NewPage Corporation.  As required by these cited provisions, Petitioners are filing

this Petition with the EPA Administrator, and providing copies to the MDE, NewPage

Corporation, the parent company of Luke Paper Company, and the EPA Region III Air Permit

Section Chief.

The Environmental Integrity Project ("EIP") is a national nonprofit organization

dedicated to advocating for more effective enforcement of environmental laws.  EIP's ability to

carry out its mission of improving the enforcement of environmental laws will be adversely

impacted if EPA fails to object to this Permit.

Environment Maryland is a statewide, citizen-based environmental advocacy

organization with over 30 years of experience working on Maryland's top environmental

4

problems. Environment Maryland and its members focus exclusively on protecting Maryland's air, water, and open spaces. Environment Maryland and its members have an interest in assuring that Luke Paper Company's Title V Permit contains all federally applicable requirements and monitoring adequate to assure compliance with those requirements. Members of Environment Maryland will be adversely impacted if EPA fails to object to this Permit.

EPA must object to the Luke Paper Title V Permit ("Permit") because it is not in compliance with the Clean Air Act. Specifically, the Permit does not contain adequate monitoring requirements. The Permit does not include Compliance Assurance Monitoring (CAM) requirements for two coal-fired power boilers, No. 24 and No. 25, or emissions standards for Hazardous Air Pollutants (HAPs) as required by section 112(j) of the Clean Air Act. Finally, EPA should object to the Permit because it contains an exemption from compliance with section 112 emission standards during startup, shutdown, and malfunction (SSM) events, in violation of the recent vacatur of this exemption by the D.C. Circuit Court of Appeals.

## BACKGROUND

The Luke Paper Company is located in Luke, Maryland, on the North Branch of the Potomac River, near the Savage River State Forest. The Luke Paper Company began operation in 1888, and manufactures softwood and hardwood pulp to produce approximately 550,000 short tons of coated paper annually. See NewPage Co., Annual Report (Form 10-K), at 7 (March 25, 2008). The Luke Paper Company mill contains several boilers in its power and recovery area, an area used for pulping chemical recovery, heat recovery in the form of steam, and fuel burning. See Air & Radiation Mgmt. Admin. Md. Dep't of the Env't, Luke Paper Company Part 70 Operating Permit Fact Sheet (No.24-001-00011) 1 (2009). The Luke Paper Company facility

also contains a pulp mill, Non-Condensable Gas (NCG) and Stripper Off-Gas (SOG) systems, a chlorine dioxide generator area, bleach room, and machine coating area. Id.

Luke Paper is a major emitter of numerous air pollutants, including sulfur oxides (SOx), nitrogen oxides (NOx), particulate matter (PM), and HAPs. See Air & Radiation Mgmt. Admin., Md. Dep't of the Env't, 2006 Emissions Inventory. In 2006 alone, Luke Paper emitted 24,935 tons of SOx and NOx, 672 tons of PM, and 270 tons of HAPs. Id.

MDE received a Title V Permit application from NewPage Corporation for the Luke Paper Mill on May 31, 2002, and deemed the application administratively complete on July 23, 2002. See Air & Radiation Mgmt. Admin., Md. Dep't of the Env't, Luke Paper Company Part 70 Operating Permit Fact Sheet (No.24-001-00011) 2 (2009).

During the initial public comment period for the Luke Paper Company's proposed Title V Permit, Petitioners timely submitted written comments to MDE on August 17, 2007. With the exception of the applicability of the recent D.C. Circuit Court of Appeals vacatur of the section 112 startup, shutdown, and malfunction (SSM) exemption in December of 2008, Petitioners raised all issues in this Petition in their comments to MDE. See App. A (Petitioner's Comments to MDE (August 17, 2007)). MDE responded to these comments on May 14, 2008. See App. B (MDE Response to Comments (May 14, 2008)). In this response, MDE stated that it will make the draft Part 70 Permit available for public review and provide a new comment period. Id. In a separate correspondence with Petitioners, MDE specifically stated that Petitioners would be notified as required by Maryland regulations when the revised draft Permit was issued for public review and comment.[1] Yet Petitioners did not receive notice of Luke Paper Company's revised Permit, or have an opportunity to comment on MDE's changes to the Title V Permit as required

---

[1] E-mail from Shannon Heafey, Air Quality Permits Program, Md. Dep't of the Envt., to Jennifer Peterson, Attorney, Environmental Integrity Project (May 12, 2008,12:45 PM EST) (on file with author).

6

by state and federal law. See 42 U.S.C. § 7661d(b)(2); 40 C.F.R. §§ 70.7(a)(1)(ii), (h)(1); Md.

Code Ann. § 26.11.03.07(B)(2). Federal regulations state that "all permit proceedings *shall*

provide adequate procedures for public notice including offering an opportunity for public

comment and a hearing on the draft permit. These procedures shall include the following: (1)

Notice shall be given: by publication in a newspaper of general circulation in the area where the

source is located or in a State publication designed to give general public notice; to persons on a

mailing list developed by the permitting authority, including those who request in writing to be

on the list; and by other means if necessary to assure adequate notice to the affected public." See

40 C.F.R. § 70.7(h)(1) (emphasis added).

 According to EPA Region III, MDE issued a revised Title V Permit for Luke Paper on

May 29, 2008.[2] Petitioners, who were on MDE's "interested party" list for the Luke Paper

Company Title V Permit, did not receive notice from MDE regarding the availability of a revised

draft Title V Permit for Luke Paper Company, an error that effectively foreclosed the

opportunity for Petitioners to participate in Luke Paper Company's Title V permitting process.

See *Sierra Club v. Johnson*, 436 F.3d 1269 (11th Cir. 2006) (holding that the EPA was obligated

to object to a proposed Title V permit, where state agency approved permit without first creating

mailing list and giving notice to persons on list, as required under Act's implementing

regulations; EPA did not have discretion to decide not to object based on its estimation that

notice violation had caused no actual harm, i.e. had not resulted in less meaningful public

---

[2] Telephone conversation with Paul Arnold, EPA Region III, Permits and Technical Assessment Branch, in Philadelphia, Pa. (Feb. 17, 2009).

participation). MDE received one comment regarding its revised Permit for Luke Paper Company, and submitted the revised draft Permit to EPA for review on July 3, 2008.[3]

MDE then issued a final Title V Permit for Luke Paper Company on January 22, 2009. MDE did not notify Petitioners that it issued a final Title V Permit for operation of Luke Paper Company. Petitioners discovered that a final Title V Permit had been issued through a conversation with a third party; and contacted MDE and EPA to verify the issuance of the final Permit. Petitioners obtained a copy of the final Permit by filing a Public Information Act (PIA) request with MDE.

Given MDE's procedural irregularities, Petitioners respectfully request that the EPA treat this petition as timely filed, consider our objections to the final Permit, and provide a response within 60 days. Alternatively, we ask that MDE be required to republish the revised draft Permit, consider any comments filed by Petitioners, and issue a final Permit for review within 30 days.

## SPECIFIC OBJECTIONS

"If any [Title V] permit contains provisions that are determined by the Administrator as not in compliance with the applicable requirements of this chapter…the Administrator shall…object to its issuance." CAA §505(b)(1), 42 U.S.C. § 7661d(b)(1) (emphasis added). EPA "does not have discretion whether to object to draft permits once noncompliance has been demonstrated." See *N.Y. Pub. Interest Group v. Whitman*, 321 F.3d 316, 334 (2d Cir. 2003) (holding that EPA is required to object to Title V permits once petitioner has demonstrated that permits do not comply with the Clean Air Act).

---

[3] Telephone conversation with Paul Arnold, EPA Region III, Permits and Technical Assessment Branch, in Philadelphia, Pa. (Feb. 17, 2009).

I.     The Permit Must Include Monitoring Requirements for Luke Paper's Power and Recovery Boilers that Assure Compliance with PM Emission Limits.

EPA must object to the Luke Paper Company Title V Permit because the Permit does not include monitoring requirements that ensure compliance with PM emission limits for boilers No. 2, No. 3, No. 24, and No. 25.  The Clean Air Act requires that "each permit issued under [Title V] shall set forth ... monitoring ...requirements sufficient to assure compliance with the permit terms and conditions" 42 U.S.C. §7661c(c).  On August 19, 2008, the D.C. Circuit Court of Appeals struck down an EPA rule that would have prohibited MDE and other state and local authorities from adding monitoring provisions to Title V permits if needed to "assure compliance." See *Sierra Club v. EPA*, 536 F.3d 673 (D.C. Cir. 2008).  The opinion emphasized the statutory duty to include adequate monitoring in Title V permits:

> "By its terms, this mandate means that a monitoring requirement insufficient 'to assure compliance' with emission limits has no place in a permit unless and until it is supplemented by more rigorous standards." Id. at 677.

The D.C. Circuit opinion makes clear that Title V permits must include monitoring requirements that assure compliance with emission limits.  The Court specifically noted that annual testing is unlikely to assure compliance with a daily emission limit, and found that state permitting authorities have a statutory duty to include monitoring requirements that ensure compliance with emission limits in Title V operating permits. Id. at 675.  In other words, the frequency of monitoring must bear some relationship to the averaging time used to determine compliance.

The Luke Paper Title V Permit, however, fails to include adequate monitoring requirements.  For example, the Luke Paper boilers No. 24 and 25 are subject to a PM limit that must be met at all times, but the Luke Paper Permit only requires a PM test once every two

9

years. See Air & Radiation Mgmt. Admin. Md. Dep't of the Env't, Luke Paper Company Part 70 Operating Permit (No.24-001-00011) 40 (2009). A stack test conducted once every two years clearly does not assure compliance with a PM limit that must be met at all times.

The Luke Paper Title V Permit should require continuous monitoring for PM emissions at Luke Paper's power and recovery boilers. Compliance with an emission limit that has to be met at all times should be measured hourly or daily, not once every two years. The EPA has certified continuous monitors for use in measuring PM emissions, and MDE has required the use of these monitors in its recent consent decree resolving opacity violations at power plants owned by Mirant Mid-Atlantic, LLC. See State of Maryland, Dept. of Env. v. Mirant Mid-Atlantic, LLC et al, Case No: CAL08-07925 (April 14, 2008).

EPA should object to the Luke Paper Permit because it does not include adequate monitoring requirements for boilers No. 2, No. 3, No. 24, and No. 25 to ensure compliance with PM emission limits in violation of the Clean Air Act. See 42 U.S.C. §7661c(c); Sierra Club v. EPA, 536 F.3d 673 (D.C. Cir. 2008). To the extent there are other emission limits in the Luke Paper Title V Permit that do not have adequate monitoring, these provisions would also violate Title V of the Clean Air Act.

II.     The Permit Must Include a CAM Plan for Boilers No. 24 and No. 25.

EPA should object to the Luke Paper Title V Permit because it does not include a CAM plan as required by Clean Air Act for boilers No. 24 and No. 25. See 40 C.F.R. §64 et seq. The CAM requirements apply to "...pollutant-specific emissions unit at a major source that is required to obtain a part 70 or 71 permit if the unit satisfies all of the following criteria: (1) The unit is subject to an emission limitation or standard for the applicable regulated air pollutant (or a surrogate thereof), other than an emission limitation or standard that is exempt under paragraph

10

(b)(1) of this section; (2) The unit uses a control device to achieve compliance with any such emission limitation or standard; and (3) The unit has potential pre-control device emissions of the applicable regulated air pollutant that are equal to or greater than 100 percent of the amount, in tons per year, required for a source to be classified as a major source." See 40 C.F.R. § 64.2. A "major source" is a stationary source that directly emits, or has the potential to emit, 100 tons per year or more of any air pollutant." 40 C.F.R. § 70.2; Md. Code Ann. § 26.11.02.01(C)(1)(b).

Luke Paper operates two coal-fired power boilers, No. 24 and No. 25, which are subject to a federally enforceable PM emission limit of 0.181 lb/MMBtu and use a baghouse to control PM emissions. See Air & Radiation Mgmt. Admin. Md. Dep't of the Env't, Luke Paper Company Part 70 Operating Permit (No.24-001-00011) 39 (2009); Md. Code Ann. § 26.11.09.06, 70 Fed. Reg. 38774 (July 6, 2005); Md. Code Ann. § 26.11.09.09, 68 Fed. Reg. 23206 (May 1, 2003). The two boilers emit from a single tall stack, and are rated 590 MMBtu/hr (No. 24) and 785 MMBtu/hr (No.25) heat capacity. Id. at 5. The Luke Paper Title V Permit authorizes the two boilers to emit approximately 1,090 tons of PM per year. Thus, these two boilers clearly have pre-control emissions high enough to trigger application of the CAM rule.

Luke Paper boilers No. 24 and No. 25 are subject to federally enforceable PM emission limits, use a control device to achieve compliance with its PM limit, and have pre-control PM emissions greater than the amount required to be classified as a major source. 40 C.F.R. §70.2, Md. Code Ann. § 26.11.02.01(C). Thus, these units must comply with the CAM Rule.[4] CAM

---

[4] Petitioners are aware that Luke Paper's Title V Permit requires a continuous opacity monitoring system ("COMS") for these units to measure opacity. Further, EPA has stated that a COMS may satisfy the CAM requirement for PM emissions from a unit. 62 Fed. Reg. 54900, 54923 (Oct. 22, 1997). However, in order for a COMS to satisfy CAM requirements for PM emissions, the permit would have to specify a lower opacity standard because "opacity standards are often established at a level which represents a likely significant exceedance of the particulate matter standard." Id. The Title V operating permit must establish appropriate indicator ranges for PM emissions in order to substitute a COMS for a CAM method. Id.

11

requirements only apply to facilities that submit Title V applications after April 20, 1998. See 40

C.F.R. §64 et seq.; 62 Fed. Reg. 54900, 54927 (October 22, 1997). MDE states that the CAM

rule is not applicable to Luke Paper Mill because a Title V application was received prior to

April 20, 1998. See App. B (MDE Response to Comments (May 14, 2008)). However, Luke

Paper Company significantly revised its initial Title V application to account for major facility

changes, including the installation of baghouse pollution controls, and re-submitted the

application to MDE on May 31, 2002. See Air & Radiation Mgmt. Admin. Md. Dep't of the

Env't, Luke Paper Company Part 70 Operating Permit Fact Sheet (No.24-001-00011) 2 (2009).

MDE determined that Luke Paper's revised Title V Permit application was administratively

complete on July 23, 2002. Id. Thus, Luke Paper is subject to the CAM requirements because

they submitted a substantially revised Title V application, which includes the addition of

pollution controls, after April 20, 1998.

Without CAM methods in place, it is not possible to determine whether a source is

complying with emission standards and limits on an ongoing basis. Absent a monitoring plan,

for example, a stack test performed once a year under ideal conditions does little to assess

whether the facility is actually complying with an emission limit that must be met on a short term

basis. The EPA must object to the Luke Paper Permit as there are no CAM methods specified to

ensure that the Luke Paper boilers No. 24 and No. 25 are not violating PM emission limits.

MDE's failure to include CAM methods in the Title V operating Permit is a violation of the

Clean Air Act. To the extent there are other units at the Luke Paper Mill, that are subject to the

CAM Rule, the failure to include a CAM plan for these units in the Title V Permit is also a

violation of the Clean Air Act.

III.   The Permit Must Include Emission Limits for Hazardous Air Pollutants for Boilers
       No. 24 and No. 25.

EPA must object to the Luke Paper Title V Permit because it does not contain emission

limits for hazardous air pollutants (HAPs) for boilers No. 24 and No. 25.  Section 112(j) of the

Clean Air Act[5] sets forth procedures for establishing emission limits for HAPs, which reflect the

maximum degree of HAP emissions reductions achievable,[6] on a case by case basis when EPA

fails to promulgate emission standards for a listed source category. See 42 U.S.C. § 7412(j).

The Clean Air Act requires the EPA to promulgate National Emission Standards for

Hazardous Air Pollutants ("NESHAP") for industrial boilers and process heaters by November

15, 2000. 42 U.S.C. § 7412(e)(1)(E); 57 Fed. Reg. 31576 (July 16, 1992); 58 Fed. Reg. 63941

(Dec. 3, 1993).  Although EPA promulgated NESHAP for industrial boilers and process heaters

on September 13, 2004, that rule was vacated by the D.C. Circuit Court of Appeals on June 8,

2007. See 69 Fed. Reg. 55218 (Sept. 13, 2004); *Natural Res. Def. Council v. U.S. Envtl. Prot.*

*Agency*, 489 F.3d 1250 (D.C. Cir. 2007).  When a court vacates a rule, it nullifies the action and

effectively "restores the status quo before the invalid rule took effect." *Envtl. Defense v. Leavitt*,

329 F.Supp.2d 55, 64 (D.D.C. 2004).  Thus, no NESHAP for industrial boilers and process

heaters was validly promulgated or currently exists.

If EPA fails to promulgate a NESHAP for a category or subcategory of sources—as EPA

has done here—then the "MACT Hammer" provisions of the Clean Air Act are triggered. 42

U.S.C. § 7412(j)(2).  An affected owner/operator must submit an application containing emission

limitations equivalent to the limitations that would have been set had the standard been properly

---

[5] Section 112(j) of the Clean Air Act is commonly referred to as the "MACT Hammer" provision. See, e.g., 67 Fed. Reg. 16582, 16589 (Apr. 15, 2002).
[6] These emission standards are commonly referred to as "National Emission Standards for Hazardous Air Pollutants," NESHAP," or "MACT standards."

13

promulgated "beginning 18 months after [the NESHAP should have been issued]." Id. §

7412(j)(2), -(3).  Once an application is submitted by an affected owner/operator, the permitting

agency is required to issue a Title V permit that contains emission limits for HAPs within

eighteen months.[7] Id. § 7412(j)(4), -(5); 40 C.F.R. § 63.52(g).  Thus, the Title V permit "shall

contain emission limitations for the hazardous air pollutants subject to regulation under this

section and emitted by the source that the Administrator (or the State) determines, on a case-by-

case basis, to be equivalent to the limitation that would apply to such source if an emission

standard had been promulgated in a timely manner . . . ." 42 U.S.C. § 7412(j)(5).

Luke Paper operates two coal-fired boilers, No. 24 and No. 25, that are subject to

regulation under section 112 of the Clean Air Act.  See Air & Radiation Mgmt. Admin., Md.

Dep't of the Env't, Luke Paper Company Part 70 Operating Permit Fact Sheet (No. 24-001-

00011) 23 (Jan. 22, 2009).  Thus, Luke Paper Company was required to submit an application

proposing MACT standards for these boilers no later than May 15, 2001, 18 months after EPA

was required to promulgate all MACT standards under the Clean Air Act.  See 42 U.S.C. §

7412(e)(1)(E); -(j)(2).  Alternatively, the deadline for Luke Paper Company to submit a MACT

application passed on December 8, 2008, 18 months after the D.C. Circuit Court of Appeals

vacated the NESHAP for industrial boilers and process heaters.  See Natural Res. Def. Council v.

U.S. Envtl. Prot. Agency, 489 F.3d 1250 (D.C. Cir. 2007); 42 U.S.C. § 7412(j)(2).

Petitioners note that even if the deadline for Luke Paper to submit a MACT application

under section 112(j) is dictated by EPA's two-part process pertaining to section112(j) MACT

---

[7] The Clean Air Act states that section 112(j) permit applications "shall be reviewed and approved or disapproved according to the provisions of section 7661d [of Title V]" and "the permit shall be issued pursuant to Title V and shall contain emission limitations for the hazardous air pollutants subject to regulation." 42 U.S.C. § 7412(j)(4), -(5). Title V states that a permitting agency "shall issue or deny the permit, within 18 months after the date of receipt" of a complete application. Id. § 7661b(c).

applications, that date has long since passed.  Federal regulations state that sources with affected

industrial boilers must submit a complete Part 2 application no later than April 28, 2004.  See 40

C.F.R. Part 63, Subpart B, Table 1.  Thus, the deadline for Luke Paper Company to submit a

complete MACT application is long overdue, and the Luke Paper Title V Permit must include

emission limits for HAPs for boilers No. 24 and 25.[8]  See 42 U.S.C. §§ 7412(j)(4)–(5), 7661b(c);

40 C.F.R. § 63.52(g).

     MDE did not include HAP emission limits for boilers No. 24 and No. 25 in the Luke

Paper Title V Permit because "[t]here is no specific guidance yet from the EPA on initiating

implementation of Section 112(j) under this vacatur."  See Air & Radiation Mgmt. Admin., Md.

Dep't of the Env't, Luke Paper Company Part 70 Operating Permit Fact Sheet (No.24-001-

00011) 2 (2009).  However, the Clean Air Act is unambiguous as to what is required by Luke

Paper Company and EPA in this situation.  Section 112(j) was enacted specifically for the

purpose of ensuring that major sources of dangerous HAPS are required to comply with strict

emission limits when EPA fails to promulgate a valid NESHAP for a source category.  EPA

itself notes that "[s]ection 112(j) of the CAA was designed to be a 'backstop' to our failure to

issue MACT standards." 67 Fed. Reg. 16582, 16589 (Apr. 5, 2002).

     MDE's failure to incorporate MACT standards for Luke Paper's boilers No. 24 and No.

25 in Luke Paper's Title V Permit has serious consequences.  According to EPA data, the Luke

Paper Mill emits over *1,000,000 pounds* of HAPs each year.[9]  Section 112(j) of the Clean Air

---

[8] See also, Office of Air Quality Planning & Standards, U.S. Envtl. Prot. Agency, Guidelines for MACT
Determinations Under Section 112(j) Requirements (EPA 453/R-02-001) 1-1—1-2 (Feb. 2002) (noting that section
112(j) requires permitting authorities to issue or revise existing Title V permits to incorporate "either an equivalent
emission limitation or an alternative emission limitation for the control of hazardous air pollutants (HAP) from the
equipment within the source category.") Id.
[9] See App. D.

15

Act is clear: MDE must include strict emission limits to control and reduce HAP emissions from boilers No. 24 and No. 25 in Luke Paper's Title V Permit.

At a minimum, the Luke Paper Title V Permit must contain a schedule of compliance designed to bring Luke Paper into compliance with section 112(j). Title V of the Clean Air Act states that each permit must include a schedule of compliance to address violations. See 42 U.S.C. § 7661c(a). There is no schedule of compliance in the Luke Paper Title V Permit, or even a requirement to submit a MACT application proposing HAPs emission limits for boilers No. 24 and No. 25. Because it does not contain the case-by-case MACT analysis and emission limits for HAPs as required by section 112(j) of the Clean Air Act or a schedule of compliance for submission of the long overdue MACT application, the EPA should object to Luke Paper Company's Title V Permit.

IV.  **The Permit Should Not Contain an Exemption from Compliance with Section 112 Emission Limits During SSM Events.**

Luke Paper Company's Title V Permit contains an illegal exemption from compliance with Subpart MM of Part 63 during SSM events. See Air & Radiation Mgmt. Admin. Md. Dep't of the Env't, Luke Paper Company Part 70 Operating Permit (No.24-001-00011) 56-60 (2009); 40 C.F.R. §§ 63.866(a); 63.6(e). On December 19, 2008, the D.C. Circuit Court of Appeals vacated the EPA's exemption from compliance with section 112 emission standards during SSM events, noting that section 112 of the Clean Air Act requires continuous compliance with section 112 emission standards. See Sierra Club v. U.S. Envtl. Prot. Agency, 551 F.3d 1019, 1027–1028 (D.C. Cir. 2008). The D.C. Circuit stated that Congress did not intend "the application of MACT standards to vary based on different time periods." Id. at 1028.

16

The D.C. Circuit's decision to vacate the section 112 SSM exemption renders it a nullity. *Envtl. Defense v. Leavitt*, 329 F. Supp. 2d 55, 64 (D.D.C. 2004). This decision restores section 112 to its meaning prior to 1994, and effectively "restores the status quo before the invalid rule took effect." Id. Thus, after the court's decision, MDE's blanket exemption from compliance with section 112 emission limits during SSM events is illegal.

The D.C. Circuit Court of Appeals rendered its decision after MDE submitted the Luke Paper Company Title V Permit to EPA, and therefore Petitioners were unable to raise this issue in its comments on the 2007 draft Title V Permit. However, the EPA is now obligated to object to the Luke Paper Company Title V Permit because it contains SSM exemptions that were vacated by the D.C. Circuit Court of Appeals; and the Permit is therefore not in compliance with the Clean Air Act. See Air & Radiation Mgmt. Admin. Md. Dep't of the Env't, Luke Paper Company Part 70 Operating Permit (No.24-001-00011) 56-60 (2009); 40 C.F.R. §§ 63.866(a); 63.6(e).

**CONCLUSION**

EPA must object to the proposed Permit because it is not in compliance with the Clean Air Act. Specifically, the Permit does not contain adequate emissions monitoring requirements to ensure compliance with PM emission limits Luke Paper Company boilers No. 24 and 25 must meet. The proposed Permit also does not include CAM requirements for pollution controls that limit PM from Luke Paper boilers No. 24 and No. 25. The proposed Permit does not include emission limits for HAPs emitted by Luke Paper Company's boilers No. 24 and No. 25 as required by section 112(j) of the Clean Air Act. Finally, EPA should object to the proposed Permit because it contains an exemption from compliance with section 112 emission standards

17

during SSM events in violation of the DC Circuit's vacatur of the section 112 SSM exemption on December 19, 2008.

Without changes to this Permit, Title V's purpose of increasing enforcement and compliance will be defeated. Title V aims to improve accountability and enforcement by "clarify[ing], in a single document, which requirements apply to a source." 57 Fed. Reg. 32250, 32251 (July 21, 1992). For all of these reasons, EPA must object to the proposed Luke Paper Company Title V Permit because it is not in compliance with the Clean Air Act or its implementing regulations.

DATED:          February 27, 2009

Respectfully submitted,

*Jennifer Peterson*

Jennifer Peterson
Attorney
ENVIRONMENTAL INTEGRITY PROJECT
1920 L Street NW, Suite 800
Washington, DC  20036
(202) 263-4449
(202) 296-8822 FAX
jpeterson@environmentalintegrity.org

*On behalf of Environmental Integrity*
*Project and Environment Maryland*

18

## CERTIFICATE OF SERVICE

I declare under penalty of perjury under the laws of the United States that I have provided copies of the foregoing Petition to persons or entities below via facsimile and certified mail on February 27, 2009:

Administrator Lisa P. Jackson
U.S. Environmental Protection Agency
Ariel Rios Building, Mail Code 1101A
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460
Fax Number: (202) 501-1450

Mark A. Suwyn
Chairman and Chief Executive Officer
NewPage Corporation
8540 Gander Creek Drive
Miamisburg, OH 45342
Fax Number: (937) 242-9324

Resident Agent for Luke Paper Company
The Corporation Trust Incorporated
300 E. Lombard Street
Baltimore, MD 21202

George (Tad) Aburn, Director
Air & Radiation Mgmt. Admin.
Maryland Department of the Environment
1800 Washington Boulevard
Baltimore, MD 21230
Fax Number: (410) 537-3202

Attn: Air Permit Section Chief, Region III
U.S. Environmental Protection Agency
1650 Arch Street, Mail Code 3AP00
Philadelphia, PA 19103-2029
Fax Number: (215) 814-2124

Plant Manager
Luke Paper Company
300 Pratt Street
Luke, MD 21540
Fax Number: (301) 359-2088

*Jennifer Peterson*
Jennifer Peterson

19

Appendix A

COMMENTS ON THE PROPOSED PERMIT FOR OPERATION OF LUKE PAPER
COMPANY (Permit Number 24-001-00011)

Submitted By:
THE ENVIRONMENTAL INTEGRITY PROJECT AND ENVIRONMENT MARYLAND

August 17, 2007



ENVIRONMENTAL
INTEGRITY PROJECT

919 Eighteenth Street NW, Suite 650
Washington, D.C. 20006
p: 202-296-8800  f: 202-296-8822
www.environmentalintegrity.org

August 17, 2007

Ms. Shannon Heafey
Air Quality Permits Program
Air and Radiation Management Administration
1800 Washington Blvd., Ste. 720
Baltimore, MD 21230-1720

Dear Ms. Heafey:

Thank you for the opportunity to submit comments on the draft Title V permit for the
Luke Paper mill in Savage, Maryland. We appreciate the considerable effort that the
Maryland Department of Environment has made to organize and explain the requirements
for this complex facility, and to make emission limitations and monitoring methods
reasonably transparent for the public. Our specific comments follow:

    a)  The draft permit does not include the compliance assurance monitoring
    (CAM) methods required by law for large units with pollution control devices.
    The CAM requirements are a fundamental part of the Clean Air Act, and critical
    to assuring compliance with emission limits for particulate matter and other
    pollutants that would only occasionally be monitored under the draft permit. For
    example, although condition A2B of the permit requires the power boilers to meet
    particulate matter emission limits on a continuous basis, the permit requires only
    that a stack test be conducted once every two years to determine compliance.

MDE received a Title V application from Luke Paper more than five years ago, and that
application should have specified CAM methods for particulate matter and other
pollutants as required by law. Maryland has spent more than five years developing the
draft permit, which allowed plenty of time to identify monitoring methods that can assure
that pollution controls are working properly.

    b)  MDE's reliance on stack testing to determine compliance with particulate
    matter emission limits is outdated. Operating conditions change frequently, and a
    scheduled three hour stack test conducted once every two years under optimal
    circumstances will have little value in predicting how well the Luke Paper
    Company is complying with hourly emission limits the rest of the year. The
    USEPA has certified continuous monitors for use in measuring particulate matter
    emissions, and MDE has required use of such monitors in its recent consent
    decree resolving opacity violations at power plants owned by Constellation
    Energy. MDE should require continuous monitoring for particulate matter
    emissions at the power and recovery boilers at the Luke Paper facility.

100% PCW

    c) The number 24 and 25 power boilers should be required to meet sulfur dioxide emission limits established at COMAR 26.11.09.07(1), which restrict sulfur dioxide emissions from the combustion of solid fuels to no more than 3.5 pounds per million Btu, and which limit the sulfur content of fuel oil and process gas burned in such boilers. It should be noted that this standard is already very lenient, and would authorize substantial emissions of a pollutant that contributes to the formation of fine particles, in a state where most of the population lives in areas that do not meet federal health based standards for this deadly pollutant.

Instead, condition A2C of the permit appears to substitute an even more lenient emission standard that was established under a consent decree negotiated twenty three years ago. That 1984 consent decree has never been incorporated into the federally enforceable state implementation plan that provides the basis for federal emission limits under the Clean Air Act. The statement of basis for the permit suggests that the sulfur dioxide emission limits established in the 1984 decree are comparable to those required under COMAR 26.11.09.07(1), but that is not apparent when comparing results under the two standards. For example, the consent decree authorizes boilers 24 and 25 to emit between 18,800 pounds and 35,200 pounds of sulfur dioxide over a three hour period. In contrast, the SIP limits emissions to a maximum of 14,437 pounds over three hours, based on multiplying the maximum rate of 3.5 pounds per million Btu times the maximum heat input of both boilers.

Boilers 24 and 25 are also authorized to burn process gas containing total reduced sulfur (TRS) compounds, and it is possible that the higher limits in the consent decree are meant to provide "headroom" for the additional sulfur dioxide emissions that may result. But the otherwise helpful fact sheet that accompanies the draft permit provides no explanation of the sulfur dioxide emissions that might be expected to result from the combustion of TRS in boilers 24 and 25, and therefore provides no justification for authorizing emission limits that are so much higher than those required under COMAR 26.11.09.07(1). MDE has an unfortunate habit of negotiating open-ended consent decrees that effectively replace emission limits required by law under the State Implementation Plan. Title V permits must include all applicable requirements, and should not displace state SIP requirements with weaker standards from twenty-four year old consent decrees.

    d) The Luke Paper Company's ("Luke Paper") draft Title V permit appears to incorporate numerous requirements and limitations found in 40 C.F.R. Part 63, Subpart DDDDD (National Emission Standards for Hazardous Air Pollutants ("NESHAP") for Industrial, Commercial, and Institutional Boilers and Process Heaters), setting forth the maximum achievable control technology ("MACT") requirements for boilers. Subpart DDDDD (the "boilers rule") was vacated by the D.C. Circuit Court of Appeals in Natural Resources Defense Council v. EPA, 489 F.3d 1250 (D.C. Cir. 2007). Therefore, Luke Paper's boilers are subject to the "MACT hammer" requirements of Clean Air Act ("CAA") §§ 112(g) and/or (j), 42 U.S.C. §§ 7412(g) and/or (j), such that where no NESHAP for boilers is in effect, the Title V permit must contain "equivalent emission limitation[s] by permit." That is, the permit "shall contain" NESHAPs for boilers, determined by the permitting authority "on a case-by-case basis, to be equivalent to the

limitation that would apply to such source if an emission standard had been promulgated...." CAA § 112(j)(5).

Because Subpart DDDDD itself has been vacated, the Luke Paper Title V permit should explicitly state that the Subpart DDDDD requirements referenced in the permit are required under the authority and mandate of CAA §§ 112(g) and/or (j), as applicable.

e)   The MACT standards reflected in the draft permit reflect new, more stringent limits for particulate matter that will be used as a surrogate for restricting HAP emissions. The Title V permit does not appear to require any monitoring of compliance with these PM limits, other than an initial performance test. MDE should require continuous monitoring of particulate matter emissions, using methods EPA has already approved, to assure compliance with the PM limits that are to be used as a surrogate for HAP controls.

f)   The annual emissions of hazardous air pollutants (HAPS) reported in the fact sheet that accompanies the draft permit are not consistent with the emissions reported to the Toxics Release Inventory, as the following comparison illustrates:

<u>Annual HAP Emissions( pounds/year)</u>

| Year | Fact Sheet | Stack Emissions Reported to TRI |
|------|-----------|--------------------------------|
| 2002 | 372,000   | 970,825   |
| 2003 | 322,000   | 965,962   |
| 2004 | 538,000   | 1,187,972 |
| 2005 |           | 1,181,103 |

MDE should reconcile these conflicting estimates, determine what impact they may have on Title V permit limits, monitoring, and reporting requirements, and consider taking enforcement action to the extent that emissions have exceeded limits or not been reported as required by law.

Thank you for considering our comments.

Sincerely,

Eric Schaeffer
Executive Director
Environmental Integrity Project

Brad Heavner
President
Environment Maryland

Appendix B

MDE RESPONSE TO PETITIONERS COMMENTS ON THE PROPOSED PERMIT
FOR OPERATION OF LUKE PAPER COMPANY (Permit Number 24-001-00011)

May 14, 2008



# MARYLAND DEPARTMENT OF THE ENVIRONMENT
1800 Washington Boulevard • Baltimore MD 21230
410-537-3000 • 1-800-633-6101

Martin O'Malley
Governor

Anthony G. Brown
Lieutenant Governor

Shari T. Wilson
Secretary

Robert M. Summers, Ph.D.
Deputy Secretary

**MAY 1 4 2008**

Mr. Eric Schaeffer
Executive Director
Environmental Integrity Project
919 Eighteenth Street NW, Suite 650
Washington, DC 20006

Mr. Brad Heavner, President
Environment Maryland
919 Eighteenth Street NW, Suite 650
Washington, DC 20006

Re: Comments on Title V Air Operating Permit for Luke Paper Company

Dear Mr. Schaeffer and Mr. Heavner:

This is response to your August 17, 2007 comments on the Title V air operating permit for Luke Paper Company.

1. Compliance Assurance Monitoring (CAM) Requirements

*"The draft permit does not include the compliance assurance monitoring (CAM) methods required by law for large units with pollution control devices..."*

Compliance Assurance Monitoring does not apply to the Luke Paper mill because the initial application for the Part 70 permit was received and determined to be complete prior to April 20, 1998. The CAM regulation CFR §64.5(b) requires an owner or operator to submit a CAM plan as part of the application for renewal of a Part 70 permit if the owner or operator is not subject to §64.5(a). §64.5(a) sets the April 20th date.

The Luke Paper mill will be required to submit a CAM plan upon permit renewal or at such time the owner or operator submits an application for a significant permit revision.

2.  Particulate Stack Testing

*"MDE's reliance on stack testing to determine compliance with particulate matter emission limits is outdated... MDE should require continuous monitoring for particulate matter emissions at the power and recovery boilers at the Luke Paper Company."*

The Department disagrees with the statement that continuous emissions monitoring for particulate matter should be required. The company has recently installed two fabric filters to replace the existing electrostatic precipitators on the Nos. 24 and 25 Boilers. The construction of these fabric filters was necessary to comply with Subpart DDDD MACT standards. Although the court vacated the MACT standards, Luke Paper Company notified the Department that it planned to complete installation of the fabric filters. In fact, as of April 2008, both new fabric filters have been installed.

An air quality permit to construct for these fabric filters was issued on 5/17/06; this permit incorporated the MACT requirements. As you are aware, the U.S. Court of Appeals for the District of Columbia vacated the boiler MACT in July 2007. Maryland is awaiting guidance from EPA regarding initiating implementation of Section 112(j) under this vacatur.

Since the 2006 permit to construct for the fabric filters incorporated the MACT standards for emission limits and testing, monitoring, reporting and record-keeping requirements, the permit was re-issued in April 2008 to incorporate Maryland emission requirements and to establish testing, monitoring, reporting and record keeping requirements as allowed under Maryland regulations.

Once EPA issues its guidance, and then Maryland will take the appropriate steps to implement EPA requirements.

The fabric filters should provide a high level of emission control. If the company is unable to demonstrate consistent compliance with particulate emission standards through periodic stack tests, then the issue of continuous emission monitoring can be re-visited during the next Title V air operating permit renewal.

Page 3

3.   Sulfur Dioxide Emission Limits

   a.   Consent Decree

> *"The number 24 and 25 power boilers should be required to meet sulfur
> dioxide emission limits established at COMAR 26.11.09.07(1), which
> restrict sulfur dioxide emissions from the combustion of solid fuels to no
> more than 3.5 pounds per million Btu, and which limit the sulfur content
> of fuel oil and process gas burned in such boilers... Instead, condition
> A2C of the permit appears to substitute an even more lenient emission
> standard that was established under a consent decree negotiated twenty
> three years ago. That 1984 consent decree has never been incorporated
> into the federally enforceable state implementation plan that provides the
> basis for federal emission limits under the Clean Air Act."*

The following is from the Federal Register dated Thursday December 20,
1984:

"The State of Maryland has submitted a Consent Order for the Westvaco
Corporation Paper Mill located in Luke, Maryland. The Consent Order
establishes a revised sulfur dioxide ($SO_2$) emissions limitation for the mill.
Although the revised $SO_2$ emissions limitation is less stringent than the
currently approved SIP limitation, the State has adequately demonstrated
that ambient $SO_2$ air quality standards will still be met. The State has also
demonstrated that PSD increments in the four PSD areas where baseline
has been triggered will not be violated.

EPA is approving this Consent Order as a revision to the Maryland SIP, as
the State submittal meets all of the requirements of the Clean Air Act and
40 CFR Part 51."

   b.   Total Reduced Sulfur (TRS)

> *"Boilers 24 and 25 are also authorized to burn process gas containing
> total reduced sulfur (TRS) compounds... fact sheet provides no
> explanation of the sulfur dioxide emissions that might be expected to result
> from the combustion of TRS in boilers 24 and 25."*

Luke Paper Company continuously monitors sulfur emissions from boilers
24 and 25 through the use of CEMS and reports these emissions annually
in their Emission Certification Reports. The following are conditions in
the permit regarding sulfur emissions from Boilers 24 and 25:

1)    The Permittee shall monitor Sulfur Dioxide emissions continuously in the combined tall stack using a continuous emission monitor (CEM) that is certified in accordance with 40 CFR Part 60, Appendix B and meets the quality assurance criteria of Department's Air Management Administration Technical Memorandum 90-01 "Continuous Emission Monitoring (CEM) Policies and Procedures" (October 1990), which is incorporated by reference. The Sulfur Dioxide CEM shall be kept properly maintained and in good working order. The Permittee shall provide sufficient back-up systems or methods to demonstrate compliance during CEM downtime.

2)    The Permittee shall maintain the following records to support the emissions certification and to demonstrate compliance with the daily limit, 66 tons per day, three-hourly limit, and 3.5 pounds per million BTU of heat input for at least five (5) years:

   a.   Identification, description, and use records of all air pollution control equipment and compliance monitoring equipment including:

      i.   Significant maintenance performed;
      ii.  Malfunctions and downtime; and
      iii. Episodes of reduce efficiency of all the equipment.

   b.   Emission data, equipment, calibration and equipment malfunction information from any continuous emission monitoring system (CEMs), if CEMS are required by the permit for either emissions calculations or compliance determinations.

   c.   Additional Information on SO₂ controls- Boiler #25 is subject to Best Alternative Retrofit Technology (BART) based on the year of its installation (BART covers units installed between 1962 and 1977). During the initial development of the Regional Haze State Implementation Plan (SIP), MANEVU (the regional organization for haze) established baseline or "presumptive" controls for boilers like unit 25 at New Page. The presumptive level of control for Boiler #25 is 90% control for SO₂.

3)    The Luke Paper fact sheet has been clarified as follows to explain why periodic monitoring for SO₂ is not necessary. By use of emissions factors and engineering calculations it can be demonstrated that it is not possible for the facility to violate the standard.

The No. 2 Black Liquor Recovery Boiler is nominally rated at 143,750 pounds of 50% black liquor solids per hour input at 204,000 pounds per hour steam output and 22,000 pounds per hour of smelt output. This unit is operated as a standby unit and was installed in 1959. During chemical recovery operation, flue gases from this unit can be discharged through any one of the three electrostatic precipitators that are used as a control mechanism for Particulate Matter on parallel stacks. The potential $SO_2$ emissions are 1,394 pounds per day or 58 pounds per hour.

Applicable $SO_2$ emission limit
**COMAR 26.11.06.05(B)(1):** A person may not cause or permit the discharge into the atmosphere from installations other than fuel-burning equipment of gases containing more than 500 ppm of sulfur dioxide. Installations constructed before January 17, 1972, are limited to not more than 2,000 ppm sulfur dioxide.

The $SO_2$ content in the exhaust flue gas from No. 2 Black Liquor Recovery Boiler is about 130 ppm, which is well below the applicable limit of 2,000 ppm.

The No. 3 Black Liquor Recovery Boiler is nominally rated at 287,500 pounds of 50% black liquor solids per hour input at 512,000 pounds per hour steam output and 46,700 pounds per hour of smelt output, this unit was installed in 1969. This unit routes flue gases through electrostatic precipitators, which are used as a control mechanism for Particulate Matter. The potential $SO_2$ emissions are 3,941 pounds per day or 164 pounds per hour.

Applicable $SO_2$ emission limit
**COMAR 26.11.06.05(B)(1):** A person may not cause or permit the discharge into the atmosphere from installations other than fuel-burning equipment of gases containing more than 500 ppm of sulfur dioxide. Installations constructed before January 17, 1972, are limited to not more than 2,000 ppm sulfur dioxide.

The $SO_2$ content in the exhaust flue gas from No. 3 Black Liquor Recovery Boiler is about 90 ppm, which is well below the applicable limit of 2,000 ppm.

Since the potential $SO_2$ emissions of No. 2 (130 ppm) and No. 3 (90 ppm) Black Liquor Recovery Boilers are well below the applicable limit, 2,000 ppm, it is not necessary to require additional emission monitoring for compliance determination.

4.    Subpart DDDD- National Emission Standards for Hazardous Air Pollutants for Industrial, Commercial, and Institutional Boilers and Process Heaters

*Subpart DDDD (the "boilers rule") was vacated by the D.C. Circuit Court of Appeals... Therefore, Luke Paper's boilers are subject to the "MACT hammer" requirements..."*

The Department, like other states in the country, is waiting for guidance from EPA, which is supposed to address this issue. We were hopeful that this guidance would have been available by now; unfortunately this has not happened. Maryland is also participating in an effort by the National Association of Clean Air Agencies (NACAA) to develop a Model Boiler MACT for state and local agencies to use in establishing case-by-case MACT under Section 112(j).

5.    Continuous Monitoring of Particulate Matter Emissions

*"The MACT standards reflected in the draft permit reflect new, more stringent limits for particulate matter that will be used as a surrogate for restricting HAP emissions. The Title V permit does not appear to require any monitoring of compliance with these PM limits, other than an initial performance test. MDE should require continuous monitoring of particulate matter emissions, using methods EPA has already approved, to assure compliance with the PM limits that are to be used a surrogate for HAP controls."*

See previous answers.

6.    Air Toxics Emissions

*"The annual emissions of hazardous air pollutants (HAPS) reported in the fact sheet that accompanies the draft permit are not consistent with the emissions reported to the Toxics Release Inventory..."*

The following is per a September 5, 2007 letter from NewPage:

"The annual Maryland inventory only includes 11 specific Hazardous Air Pollutants (HAPs); the TRI list included 16. The 11 HAPs in the MDE Inventory are specified in the instructions for the inventory.

TRI chemicals are only reportable if certain thresholds are triggered.

TRI data includes emissions from both MD and WV sources; the MDE Inventory is specific to only MD emissions.

TRI data includes non-detect values (calculated at one half the detection level) of chemical emissions expected to be present.

Emissions may be different due to the timing of the release of emission factors. The MDE Inventory is due before the new TRI emission factors are available."

MDE's review of NewPage's response is as follows:

The TRI shows zero emissions from Luke in West Virginia.

TRI and Maryland both have reporting trigger levels. They are not inherently the same. There can be some differences on reporting trace level chemicals as a result.

The TRI has an assumption of ½ a minimum level for non-detects.

There is a timing difference between the reporting periods for the TRI and MDE emissions inventory.

As a result of the revisions made to the Part 70 permit due to the Industrial Boiler MACT vacatur, the Department is making the revised Part 70 permit available for public review and providing a new comment period. If MDE receives any additional comments at that time, they will be reviewed and incorporated as necessary into the proposed permit, which together with the final Response to Comments Document, will be sent to EPA Region III. If the EPA does not object to the permit conditions, the permit may be issued at that time. Citizens have 60 days to petition EPA to object to the permit; this petition period begins the calendar day after the end of the EPA 45-calendar-day review period. The applicable petition period dates will be posted on the EPA website http://www.epa.gov/reg3artd/permitting/petitions2.htm. Please refer to that webpage for information on the proposed Luke Title V permit.

If you have any questions, please feel free to call me at 410-537-4433 or contact me via email at sheafey@mde.state.md.us.

Sincerely,

Shannon Heafey, Title V Coordinator
Air Quality Permits Program
Air & Radiation Management Administration

SH/jm

Appendix C


LETTER TO JUDY KATZ, EPA REGION III, REGARDING PROCEDURAL
IRREGULARITIES IN MARYLAND'S TITLE V PERMIT ISSUANCE

Submitted By:
THE ENVIRONMENTAL INTEGRITY PROJECT


February 23, 2009



ENVIRONMENTAL
INTEGRITY PROJECT

1920 L Street NW, Suite 800
Washington, DC 20036
p: 202-296-8800 f: 202-296-8822
www.environmentalintegrity.org

February 23, 2009

Judy Katz
U.S. Environmental Protection Agency, Region III
1650 Arch Street
Mail Code: 3AP00
Philadelphia, PA 19103-2029

*RE: Maryland Title V Petition Procedures / Status of Citizen Petition*

Dear Ms. Katz:

I am writing to request clarification regarding the procedures for petitioning the Administrator of the U.S. EPA to object to deficient Title V operating permits issued by the Maryland Department of the Environment (MDE), and inquire as to the status of our petition regarding Maryland's implementation of Title V of the Clean Air Act. It is unclear from the Maryland regulations pertaining to Title V petition procedures when EPA's 45-day review period takes place. See Md. Code Ann. 26.11.03.09, -.10 (noting only that EPA has 45 days to review a permit, and citizens have 60 days from the end of EPA's review period to petition EPA).

The Environmental Integrity Project has been advised that the EPA 45-day review period is concurrent with the 30-day public comment period unless adverse comment is received on the draft Title V permit. In that situation, EPA's 45-day review period is halted, and begins again only when MDE submits a revised package to EPA that includes public comments, MDE's responses to these comments, and the proposed Title V permit.

There appear to be several instances where this "general policy" is not applicable. For example, MDE does not always issue a proposed Title V permit to EPA for review at the same time it issues a draft Title V permit for comment.[1] In this situation, the only mechanism to alert the public to the start of EPA's 45-day review period, which triggers the petition deadline, is MDE's website. While we appreciate MDE's efforts to maintain a website to encourage public participation, the website often displays inaccurate or incomplete information.[2] Because of these inaccuracies, the public cannot rely upon this website for accurate public participation information and deadlines.

---

[1] The Millennium Inorganic Chemical and Mirant Chalk Point draft permits were noticed for public comment, but have not been sent to EPA for review.

[2] See Attachment A. On February 19, 2009, the website displayed petition deadlines for Mirant Morgantown and Constellation CP Crane that do not correspond with EPA deadlines, and the incorrect end date for the public comment period for the Wheelabrator incinerator. In addition, the Mirant Chalk Point draft permit did not appear on the MDE website as available for public review during the entire initial comment period.

This problem is compounded when MDE fails to follow required notification procedures when draft permits are available for review.  MDE's regulations require them to notify persons on an "interested parties" list when MDE issues a draft Title V permit for public comment in addition to providing notice in a newspaper.[3]  EIP is aware of at least one instance where MDE failed to notify an "interested person" that a draft Title V permit was available for review.[4]

Furthermore, this "general policy" does not appear to be a formal agreement between MDE and EPA, and is subject to change at any moment without notice to the public.

We understand that Region III is aware of the lack of clarity in the Title V petition procedures in Maryland's program, and is in the process of addressing these deficiencies.  The uncertainty surrounding the timing of EPA's 45-day review period for Maryland Title V permits hinders public participation in the Title V permitting process.  We respectfully request clarification as to the Title V petition procedures for Maryland facilities.

Finally, we would like to inquire as to the status of our petition regarding Maryland's implementation of the Clean Air Act.

Thank you.

Best,

*Jennifer S. Peterson*

Jennifer S. Peterson

---

[3] See Md. Code Ann. 26.11.03.07(B)(2) (noting that MDE must provide notice "as directed by the Department, to any person who has made a timely request to the Department in accordance with procedures established by the Department for making the requests").

[4] EIP's Executive Director, Eric Schaeffer, is on MDE's "interested persons" list, but did not receive notification that the New Page (i.e. Luke Paper) revised draft permit was available for review.

Attachment A



Problem Solver | Maryland.gov | Online Services | State Agencies | Phone Directory

Search

Email Friend    print page

**MDE HOME  |  WORK WITH MDE  |  PROGRAMS  |  PERMITS  |  MDE CALENDAR**

Home > Permits > Title 5 Program Information > title5draftpermits.asp



Air Quality
General Permit

Permits to
Construct &
Operate

Title 5 Program
Information

Toxic Air
Pollutant
Regulations
Documents

Air Permits
Home

**Draft Part 70 Permit Comment Periods
Opportunity for Public Review**

The following draft permits are available for public review and comment at the Department and also at the library nearest the facility. A notice was published on the "Beginning" date as listed below in the legal section of a newspaper of general circulation in the area where the facility is located.

Interested persons may submit written comments or request a public hearing on the draft permit. Written comments must be received by the Department no later than 30 days from the publication date of the newspaper notice. Requests for a public hearing must be submitted in writing and must also be received by the Department no later than 30 days from the publication date of the newspaper notice.

Comments and requests for a public hearing will be accepted by the Department if they raise issues of law or material fact regarding applicable requirements of Title V of the Clean Air Act, and/or regulations implementing the Title V Program in Maryland found in COMAR.

A Request for a public hearing shall include the following:

1) The name, mailing address, and telephone number of the person making the request;

2) The names and addresses of any other persons for whom the person making the request is representing; and

3) The reason why a hearing is requested, including the air quality concern that forms the basis for the request and how this concern relates to the person making the request.

All written comments and requests for a public hearing should be directed to the attention of Ms. Shannon Heafey, Air Quality Permits Program, Air and Radiation Management Administration, 1800 Washington Boulevard Suite 720, Baltimore, Maryland 21230-1720. Further information may be obtained by calling Ms. Shannon Heafey at (410) 537-4433.

Permit Resources
- Permit Guide
- Download Permit Applications
- Permitting Customer Survey
- Permitting Assistance
- Maryland Business Assistance Providers
- Small Business Assistance
- COMAR Online
- Pollution Prevention
- Part 70 Development White Paper
- Part 70 Improvement White Paper

| Facility | Beginning | End |
|---|---|---|
| Charles County Landfill No. 2 | 08/01/08 | 08/31/08 |
| Constellation CP Crane | 10/25/08 | 11/24/08 |
| Constellation Notch Cliff | 10/29/08 | 11/28/08 |
| Constellation Perryman | 10/31/08 | 11/30/08 |
| Constellation Philadelphia Road | 11/13/08 | 12/13/08 |
| Constellation Westport | 02/09/09 | 03/11/09 |
| Forty West Landfill | 09/04/08 | 10/04/08 |
| MAA BWI Airport | 09/20/08 | 10/20/08 |
| Millennium Inorganic Chemical | 11/29/08 | 02/16/09 |
| Mirant Mid Atlantic Chalk Point | 07/31/08 | 10/22/08 |
| Mirant Mid Atlantic Dickerson | 11/03/08 | 01/06/09 |
| Mirant Mid Atlantic Morgantown | 10/01/08 | 11/01/08 |
| National Institutes of Health | 07/25/08 | 08/24/08 |
| National Inst. of Standards | 10/08/08 | 11/07/08 |
| Northern Landfill | 10/22/08 | 11/21/08 |
| Quarantine Road Landfill | 12/22/08 | 01/21/09 |
| Social Security Administration | 11/06/08 | 12/06/08 |
| Sunoco Terminal | 02/09/09 | 03/11/09 |
| Trigen Energy Central Plant | 11/21/08 | 12/21/08 |
| Washington County Hospital | 08/04/08 | 09/03/08 |
| Wheelabrator | 01/31/09 | 03/03/09 |

Petitions to EPA for Title V Permit Objections

| Facility | Last Day for Petition |
|---|---|
| Charles County Landfill No. 2 | 11/17/08 |
| Constellation CP Crane | 03/23/09 |
| Constellation Notch Cliff | 03/18/09 |
| Constellation Perryman | 03/18/09 |
| Constellation Philadelphia Road | 03/26/09 |
| Forty West Landfill | 03/06/09 |
| Ingenco | 12/10/08 |
| Johns Hopkins Hospital | 12/10/08 |
| MAA BWI Airport | 01/06/09 |
| Mirant Dickerson | 04/27/09 |
| Mirant Morgantown | 03/19/09 |
| National Institute of Standards and Tech | 01/27/09 |
| New Page (Luke/Westvaco) | 10/15/08 |
| Northern Landfill | 02/06/09 |
| Quarantine Road Landfill | 04/05/09 |
| Social Security Administration | 03/18/09 |
| Trigen Energy Central Plant | 03/10/09 |
| Washington County Hospital | 11/26/08 |

Back to top



Contact the Office  |  Accessibility  |  Privacy Notice

**Jennifer Peterson**

| | |
|---|---|
| From: | Shannon Heafey [sheafey@mde.state.md.us] |
| Sent: | Monday, February 02, 2009 5:10 PM |
| To: | Jennifer Peterson |
| Cc: | Karen Irons |
| Subject: | RE: Public Participation Opportunity -Wheelabrator Baltimore,   L.P. |
| Attachments: | WheelabratorT5 revised permit.doc; wheelabrator revised factsheet.doc |

Here are the documents as requested

Shannon L. Heafey,Title V Coordinator
Air Quality Permits Program
Air and Radiation Management Administration
410-537-4433

>>> Jennifer Peterson <jpeterson@environmentalintegrity.org> 1/30/2009 3:26 PM >>>
I would like to request a copy of the permit and fact sheet for this facility. Thanks for your help.

Best,

Jennifer Peterson

-----Original Message-----
From: Shannon Heafey [mailto:sheafey@mde.state.md.us]
Sent: Friday, January 30, 2009 3:27 PM
To: Shannon Heafey
Subject: Public Participation Opportunity -Wheelabrator Baltimore, L.P.

As an interested party in the Air Quality Permitting process, the Department would like to inform you of its intent to issue a renewal Part 70 Operating Permit to Wheelabrator Baltimore L.P. located in Baltimore, MD.

A public hearing has been scheduled for March 3, 2009 at 7PM at MDE Headquarters located at Montgomery Park, 1800 Washington Boulevard, Baltimore MD 21230 in the Aqua and Terra Conference Rooms (First Floor Reception Area).

An information sheet that briefly describes the Part 70 Program and the public notice announcing the public participation opportunity is attached.

The enclosed notice will be published in the legal section of a daily or weekly newspaper of general circulation in the geographic area in which the facility is located, the Baltimore Sun. Written comments for this draft permit must be submitted to the Department no later than March 8, 2009. Please submit any comments to the Department to the attention of Ms. Shannon Heafey, Air and Radiation Management Administration, 1800 Washington Boulevard, Suite 720, Baltimore, MD 21230-1720.

As required by COMAR 26.11.03.07E, written comments shall include the following information:
(1)   The name, address and telephone number of the person submitting the comments;
(2)   The names and mailing addresses of persons whom the person making the comments is representing; and
(3)   The the air quality concern that forms the basis for the comments, and how this concern relates to the person making the request.

If you have any questions about the permitting process or the public participation process, please feel free to call me.

1

Shannon L. Heafey, Title V Coordinator
Air Quality Permits Program
Air and Radiation Management Administration
410-537-4433

-------------------------------------------------
The information contained in this communication may be confidential, is intended only for the use of the recipient named above, and may be legally privileged.
If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited.
If you have received this communication in error, please re-send this communication to the sender and delete the original message and any copy of it from your computer system. Thank you.
-------------------------------------------------
<<<<GWIASIG 0.07>>>>

2



ENVIRONMENTAL
INTEGRITY PROJECT

1920 L Street NW, Suite 800
Washington, DC 20036
p: 202-296-8800 f: 202-296-8822
www.environmentalintegrity.org

August 26, 2008

*VIA CERTIFIED MAIL AND ELECTRONIC MAIL*
Ms. Shannon Heafey
Air Quality Permits Program
Air and Radiation Management Administration
1800 Washington Blvd., Ste. 720
Baltimore, MD 21230-1720
sheafey@mde.state.md.us

*RE: OPERATING PERMIT FOR MIRANT CHALK POINT, LLC (NO. 24-033-00014)*

Dear Ms. Heafey,

Thank you for the opportunity to submit comments on the draft Title V permit for the Mirant Chalk Point, LLC ("Chalk Point") power plant in Prince George's County, Maryland. We appreciate the considerable effort that the Maryland Department of Environment ("MDE") has made to organize and explain the requirements for this facility, and to make emission limitations and monitoring methods reasonably transparent for the public. Our comments are as follows:

## A.  General Comments

*MDE should identify all draft Title V permits that are open for public comment on MDE's website.*

The Chalk Point draft Title V permit was not identified on MDE's website as open for public comment under "Draft Part 70 Permit Comment Periods Opportunity for Public Review."[1] (*See* Attachment A). Public participation in the permitting process is an important goal of the Title V program, and is crucial to ensuring that Title V permits contain easily identifiable emission standards, limits, and monitoring requirements for the facility, the public, and the permitting agency.

The failure to identify the public comment period for the Chalk Point power plant on the MDE website is a particularly significant oversight given that Chalk Point is the third largest

---

[1] Air & Radiation Mgmt. Admin., Md. Dep't of the Env't, Draft Part 70 Public Comment Periods Opportunity for Public Review, http://www.mde.state.md.us/Permits/AirManagementPermits/Title5/title5draftpermits.asp (last visited Aug. 25, 2008).

1

100% PCW

source of air pollution in Maryland, emitting over 61,000 tons of air pollutants annually.[2] In addition, this is the initial Title V permit for this facility. Further, the fact that MDE has identified some, but not all, facilities with draft Title V permits open for comment on the website induces reliance on this information by the public, such that interested parties may assume the information is accurate and complete. The MDE website should contain current, complete, and accurate information on the status of Title V permits for Maryland facilities to ensure that the public participation requirements of the Clean Air Act are met.

## B.  Emission Units: E-3 and E-4

*1.  Unit E-4 should be required to meet the particulate matter emission limits established at COMAR 26.11.09.06(B)(2), which restrict particulate matter emissions for equipment burning residual fuel built after July 1, 1975 to 0.010 gr/scfd.*

Unit E-4 is a large boiler rated at 640 megawatts that, according to the draft fact sheet, was installed in 1981. The primary fuel for this boiler is No. 6 fuel oil, which is a residual fuel. The boiler is subject to the particulate emission limits in Table 1 at COMAR 26.11.09.09, which is 0.010 gr/scfd for residual fuel burning equipment built after July 1, 1975.

The draft Title V permit, however, states that the maximum allowable emission of particulate matter from Unit E-4 is 0.020 gr/scfd. The permit to construct this boiler was issued on July 21, 1972. However, the draft permit states the boiler was not installed until 1981. The 0.010 gr/scfd particulate emission limit applies to units "built" after July 1, 1975, as opposed to units that are "permitted" or "commence construction" after July 1, 1975.

Although it is possible the unit was built prior to July 1, 1975 and sat fully constructed without operating from July 1, 1975 until 1981, it seems unlikely. There is no information in the draft Title V permit or fact sheet that suggests this scenario. The Title V permit should be amended to require that Unit E-4 comply with the 0.010 gr/scfd particulate matter emission limit.

*2.  Units E-3 and E-4 should be required to install an electrostatic precipitator or other dust collector device designed to control particulate matter pollution as required by COMAR 26.11.09.06(B)(1).*

The draft Title V permit should be amended to reflect the requirement that Units E-3 and E-4 install a dust collector device designed to control particulate matter pollution. COMAR 26.11.09.06(B)(1)(a) states that in Areas III and IV, "[a] person may not cause or permit the combustion of residual fuel oil in fuel burning equipment unless the equipment is fitted with a dust collector which is so designed that it can reasonably be expected to produce sufficient dust particle force, residence time, and particle retention to satisfy [particulate matter emission limits] in Table 1." Chalk Point is located in Prince George's County, Area IV, and Units E-3 and E-4 burn No. 6 fuel oil, residual oil, as the primary fuel. These two boilers must install a dust collector device designed to achieve compliance with particulate matter emission limits.

---

[2] Air & Radiation Mgmt. Admin., Md. Dep't of the Env't, Emissions Inventory (2006).

2

The numerous consent decrees applicable to Chalk Point do not appear to waive this requirement. Although the 2006 Consent Decree requires that Mirant install human machine interface technology on Units E-3 and E-4 that "include proactive alarming and feedback from opacity monitors to controls to manage the duration and frequency of soot blowing," the order does not waive or replace the pollution control requirement in COMAR. (¶ 3). The 2006 Consent Decree also states that certain requirements of the order will terminate once Mirant installs electrostatic precipitators or other pollution control devices on Units E-3 and E-4. (¶ 5). However, the order does not require pollution control devices for particulate matter or identify a date when pollution control devices for particulate matter are required for these two boilers.

The boilers' lack of pollution control devices for particulate matter is particularly significant because the March 2008 Consent Decree does not require Chalk Point to install particulate matter CEMs on Units E-3 and E-4, and there appears to be at least some evidence that these two units may be unable to comply with particulate matter emission limits. For example, a report prepared by Mirant in January of 2006 showed particulate matter emissions from Unit E-4 as high as 0.0241 gr/dscf. (*See* Attachment B, "Final Report: Compliance Source Test of Particulate Emissions from Unit 4 Chalk Point Generating Station").

Regardless of whether Chalk Point is able to demonstrate compliance with the particulate matter emission limit, dust collector devices must be installed on Units E-3 and E-4 as required by COMAR 26.11.09.06(B)(1)(a). The Title V permit, therefore, should be amended to require Units E-3 and E-4 to install a dust collector device to control particulate matter emissions. In addition, the Title V permit should include a CAM plan for particulate matter emissions as required for large units with pollution control devices.

### 3. The draft Title permit should include the conditions to construction that were set forth in the certificates of public convenience and necessity for Units E-3 and E-4.

The draft Title V permit states that Units E-3 and Units E-4 were issued certificates of public convenience and necessity ("CPCN") on June 29, 1971 and July 21, 1972. However, the draft permit does not include the construction conditions applicable to these two boilers. These conditions, to the extent there are any,[3] should be clearly identified in the Title V permit so that the facility, the state, and the public understand what conditions these units are subject to. This is particularly important in this situation because the CPCN orders are not available on the Maryland Public Service Commission website due to their antiquity.

### 4. Unit E-4 may have been improperly exempted from compliance with prevention of significant deterioration ("PSD") rules.

Unit E-4 may have been improperly grandfathered under the PSD rules. All new or modified fossil-fuel fired power plants greater than 1000 million Btu per hour heat input that "commence construction" after June 1, 1975 are required to comply with federal PSD rules.[4]

---

[3] We have requested a copy of both CPCN orders from the Maryland Public Service Commission, but have been unable to obtain these orders at the time these comments were filed to verify what conditions were imposed on these two units.

[4] *See* Prevention of Significant Deterioration, 39 Fed. Reg. 42,510, 42,516 (Dec. 5, 1974).

"Construction means fabrication, erection, or installation of an affected facility."[5] "Commenced means that an owner or operator has undertaken a continuous program of construction or modification or that an owner or operator has entered into a binding agreement or contractual obligation to undertake and complete, *within a reasonable time*, a continuous program of construction or modification."[6]

As discussed previously, the CPCN was issued for Unit E-4 on July 21, 1972, but the boiler was not installed until 1981. It is unclear from the draft permit as to when construction was commenced on this boiler, particularly given the significant amount of time that lapsed between the time the CPCN was issued and the date of installation. If construction was commenced, as defined by the PSD rules, on Unit E-4 after June 1, 1975, this boiler is subject to the PSD rules and the Title V permit should reflect this.

## C. Emission Units: E-1 and E-2

### 1. *The March 2008 Consent Decree significantly weakens particulate matter emission limits for Chalk Point Units E-1 and E-2.*

Although the March 2008 Consent Decree established particulate matter limits and monitoring requirements that are an improvement over existing standards, it contains several provisions that weaken existing emission standards in Maryland's state implementation plan ("SIP"). We are aware that MDE has submitted the March 2008 Consent Decree to the United States Environmental Protection Agency ("USEPA") for approval to be incorporated into Maryland's SIP. However, we would like to note that several of the provisions of the March 2008 Consent Decree amount to a significant weakening of emission limits for a major source of air pollution.

First, the consent decree authorizes a startup and shutdown exemption for particulate matter emissions. The consent decree states that when demonstrating compliance with the particulate matter emission limit, "particulate matter emissions during periods of startup and shutdown shall not be included." (¶ 38). The particulate matter emission limit set forth in COMAR does not allow for a startup and shutdown exemption.

The consent decree also states that "startup" ends when the generating unit reaches minimum load levels. *Id.* According to the terms of the consent decree, for example, Chalk Point Units E-1 and E-2 reach "minimum load levels" when the units generate 210 gross megawatts. *Id.* The exemption authorized in the consent decree is significant because the Chalk Point plant appears to run below this threshold during normal operation.

For example, Unit 1 at the Chalk Point plant ran well below 210 gross megawatts—126 to 149—for over forty-two hours on December 8 and December 9 of 2007.[7] On May 31, 2007,

---

[5] *Id.*
[6] *Id.* (emphasis added).
[7] Office of Air & Radiation, U.S. Envtl. Prot. Agency, Clean Air Markets – Data and Maps, Emissions, Unit ARP Emissions Report for Mirant Chalk Point.

4

Unit 1 ran below 210 gross megawatts for twelve hours.[8]  Unit 2 ran below the minimum load level established in the consent decree for thirteen hours on March 23, 2007 and nine hours on October 29, 2007.[9]  These load levels did not immediately follow startup of the units, which suggests that these two units were running at these power levels during normal operations.[10]  The exemption for emissions produced during startup in the consent decree, then, also effectively exempts emissions from the Chalk Point plant during normal operating conditions.

In addition, the consent decree weakens SIP standards by allowing Chalk Point to demonstrate compliance based on 24-hour averages. (¶ 32).  Particulate matter emission limits established by the SIP must be met at all times.  This weakens the SIP standard because Chalk Point is able to violate the particulate matter emission limit throughout the day while still complying with the limit over a 24-hour period.

Finally, the consent decree authorizes weaker emission limits because the consent decree only requires that the continuous emissions monitoring system ("CEMS") used to demonstrate compliance with the emission limit work 75% of the time. (¶ 38).  The consent decree states that "when PM CEMS are used to demonstrate compliance . . . each PM CEMS shall, at a minimum, obtain valid PM CEMS hourly averages for seventy-five percent (75%) of all operating hours on a 30-day rolling average." *Id.*  Chalk Point could potentially violate the particulate matter emission limit 25% of the time, which is a significantly weaker standard than the continuous requirement contained in the SIP.

   2.  *The draft Title V permit should include a compliance assurance monitoring ("CAM") plan as required by the Clean Air Act and the March 2008 Consent Decree for particulate matter emissions.*

Under the Clean Air Act, and the specific terms of the March 2008 Consent Decree, Mirant is required to submit an interim CAM plan for particulate emissions for the common stack for Units E-1 and E-2 no later than thirty calendar days following entry of the Consent Decree. (¶ 22).  CAM methods are a fundamental requirement of the Clean Air Act, and are critical to ensuring compliance with emission limits for pollutants that would only occasionally be monitored under the Title V permit.  The draft Title V permit states that an interim CAM plan is required as a condition of the March 2008 Consent Decree.  However, the actual CAM plan is not incorporated into the Title V permit, and may not be federally enforceable.

It appears that MDE intends to incorporate the final CAM plan into the Title V permit when MDE approves the final CAM plan.  There is no specific deadline for MDE to approve a final CAM plan for Units E-1 and E-2 identified in the draft Title V permit, and it seems unlikely that MDE will revise the Title V permit prior to the five year renewal.  MDE should incorporate the interim CAM plan for these units into the Title V permit.

---

http://camddataandmaps.epa.gov/gdm/index.cfm?fuseaction=emissions.wizard (last visited Apr. 29, 2008) [hereinafter EPA, Unit ARP Emissions Report for Mirant Chalk Point]
[8] *Id.*
[9] *Id.*
[10] *See id.*

3. *The draft Title V permit should state that Units E-1 and E-2 must use a continuous monitoring method to demonstrate compliance with mercury limits established in the Healthy Air Act.*

The Title V permit should clearly state that Units E-1 and E-2 must continuously monitor for mercury emissions under the Healthy Air Act. The draft permit does state that these units are subject to the mercury emission limits and reporting requirements of the Healthy Air Act. However, the permit does not expressly state that Chalk Point is required to use a continuous monitoring method to demonstrate compliance with mercury limits. To avoid confusion, this requirement should be clearly identified in the Title V permit.

## D. Emission Units: E-CT3 thru E-CT6 and SMECO-CT1 (Five Combustion Turbines)

1. *The draft permit fails to include monitoring requirements sufficient to ensure compliance with annual and hourly mass limits for sulfur dioxide, carbon monoxide, particulate matter, and volatile organic compounds emissions established by the prevention of significant deterioration ("PSD") permit.*

The draft permit does not include monitoring requirements that ensure Chalk Point's compliance with the combined annual mass limits, and individual hourly, mass limits for sulfur dioxide, carbon monoxide, particulate matter, and volatile organic compounds ("VOCs") established by the PSD permits[11] for the five combustion turbines identified as E-CT3 through E-CT6 and SMECO-CT1. Section 504(c) of the Clean Air Act states that Title V operating permits must include monitoring requirements that "assure compliance with the permit terms and conditions." 42 U.S.C. § 7661c(c). Further, federal rules require that Title V operating permits include "periodic monitoring [requirements] sufficient to yield reliable data that [is] representative of the source's compliance" with an emission limit or standard if the underlying emission limit or standard does not require periodic testing. 40 C.F.R. § 70.6(a)(3)(i)(B). Monitoring requirements are critical to ensuring that a facility is complying with the Clean Air Act.

Chalk Point's PSD permits established combined annual mass limits for E-CT3 through E-CT6, and individual hourly mass limits for all five combustion turbines for sulfur dioxide, carbon monoxide, particulate matter, and VOCs. For example, the PSD permit states Units E-CT3 through E-CT6 may not burn fuel with sulfur content greater than 0.2%, as well as establishes an annual combined mass limit and an individual hourly mass limit for sulfur dioxide emissions. The PSD permit for SMECO-CT1 states the combustion turbine may not burn fuel with sulfur content greater than 0.3%, and establishes an hourly mass limit. However, the draft permit only requires that Chalk Point obtain fuel supplier certifications demonstrating compliance with the sulfur content in fuel limitation.

---

[11] CPCN Order No. 68841 (Case 8228) and CPCN Order No. 68587 (Case 8102). We have requested copies of these orders from the Maryland Public Service Commission, but have not been provided copies at the time we submitted comments. All information regarding the PSD conditions for these units has been obtained from the draft Title V permit and fact sheet.

The draft permit does not include any monitoring requirements that show the facility is complying with the individual hourly mass limits for sulfur dioxide. Although Chalk Point must submit quarterly reports of average sulfur dioxide emissions based on emission factors and equations, this is clearly insufficient to demonstrate compliance with the *hourly* mass limits specified in the PSD permits. [12]

Similarly, the draft permit fails to include sufficient monitoring to ensure compliance with combined annual and individual hourly mass limits for emissions of carbon monoxide, particulate matter, and VOCs. Chalk Point is only required to "perform preventative maintenance to maintain the turbines as designed" according to the draft permit. There is no specific preventative maintenance plan, nor any explanation as to how the vague requirement to perform preventative maintenance ensures that Chalk Point meets the combined annual or individual hourly mass limits for carbon monoxide, particulate matter, and VOCs. This is clearly insufficient to ensure compliance with the PSD limits established for these pollutants.

The critical need for sufficient monitoring requirements to ensure compliance with VOC emission limits is particularly relevant given the fact that Chalk Point avoided major new source review based on the emission limits established in the PSD permit for Units E-CT3 through E-CT6. Chalk Point was able to qualify for the synthetic minor limitation, which allowed Chalk Point to avoid more stringent pollution control based on the hourly and annual mass limits in the PSD permit. The draft permit should include sufficient monitoring to demonstrate Chalk Point is complying with the PSD limits.

2. *The draft permit impermissibly weakens sulfur dioxide emission limits established by the PSD permit.*

The draft permit impermissibly weakens PSD limits for sulfur dioxide emissions for the five combustion turbines. The Clean Air Act prohibits states from adopting regulations or enforcing emission standards that are less stringent than its current SIP. 42 U.S.C. § 7416. Each individual combustion turbine must comply with the PSD sulfur dioxide emission limit *every hour*. However, the draft permit allows Chalk Point to demonstrate compliance with the individual hourly mass limit with a quarterly report that estimates monthly sulfur dioxide emissions based on emission factors. Expanding the emission limit from one hour for each individual turbine to a monthly average for all turbines allows for an emissions increase over the PSD limits because individual units are able to violate the hourly emission limit while the facility is still complying with the limit on an annual basis.

---

[12] It is arguable as to whether the submission of these monthly reports based on emission factors and equations is even sufficient to ensure compliance with the combined annual mass limit given the inherently unreliable emissions data generated by the use of emission factors and equations. Regardless, these reports do not ensure compliance with the hourly mass limit each individual turbine is subject to for sulfur dioxide emissions.

7

E.   Emission Units: E-AUX6 and E-AUX7 (Boilers)

> *Units E-AUX6 and E-AUX7 may have been improperly exempted from compliance with PSD rules.*

Units E-AUX6 and E-AUX7 may have been improperly grandfathered under the PSD rules. All new or modified fossil-fuel fired power plants greater than 1000 million Btu per hour heat input that "commence construction" after June 1, 1975 are required to comply with federal PSD rules.[13] It is not entirely clear from the draft permit when construction was commenced on auxiliary boilers E-AUX6 and E-AUX7. The draft Title V fact sheet states that Units E-AUX6 and E-AUX7 were installed in 1981, and the draft permit simply states that construction was commenced prior to 1984. If MDE determines that construction on these two boilers commenced after June 1, 1975, the two units should be required to comply with PSD rules and the Title V permit should reflect these requirements.

Thank you for considering our comments.

Sincerely,

*Jennifer Peterson*

Jennifer Peterson
Attorney
Environmental Integrity Project
1920 L Street NW, Suite 800
Washington, DC   20036
(202) 263-4449

Mike Tidwell
Director
Chesapeake Climate Action Network
PO Box 11138
Takoma Park, MD   20912

Andrew Fellows
Chesapeake Program Director
Clean Water Action
711 West 40th Street, Suite 209
Baltimore, MD   21211

Frederick Tutman
Patuxent Riverkeeper
18600 Queen Anne Road
Rear Barn
Upper Marlboro, MD   20774

---

[13]*See* Prevention of Significant Deterioration, 39 Fed. Reg. 42,510, 42,516 (Dec. 5, 1974) *and* discussion *supra* section C.B.4.

Attachment A




Sheri T. Wilson
Secretary

MARYLAND

Martin O'Malley
Governor

Anthony G. Brown
Lt. Governor

DEPARTMENT OF THE ENVIRONMENT

Search

Contact Us

Work With MDE | MDE Calendar | Environmental Programs | Permits | Text Only

Home > Permits > Title 5 Program Information > title5draftpermits.asp

Air Quality General Permit

Permits to Construct & Operate

Title 5 Program Information

Toxic Air Pollutant Regulations Documents

Air Permits Home



**Draft Part 70 Permit Comment Periods**
**Opportunity for Public Review**

The following draft permits are available for public review and comment at the Department and also at the library nearest the facility. A notice was published on the "Beginning" date as listed below in the legal section of a newspaper of general circulation in the area where the facility is located.

Interested persons may submit written comments or request a public hearing on the draft permit. Written comments must be received by the Department no later than 30 days from the publication date of the newspaper notice. Requests for a public hearing must be submitted in writing and must also be received by the Department no later than 30 days from the publication date of the newspaper notice.

Comments and requests for a public hearing will be accepted by the Department if they raise issues of law or material fact regarding applicable requirements of Title V of the Clean Air Act, and/or regulations implementing the Title V Program in Maryland found in COMAR.

A Request for public hearing shall include the following:

1)  The name, mailing address, and telephone number of the person making the request;

2)  The names and addresses of any other persons for whom the person making the request is representing; and

3)  The reason why a hearing is requested, including the air quality concern that forms the basis for the request and how this concern relates to the person making the request.

All written comments and requests for a public hearing should be directed to the attention of Ms. Shannon Heafey, Air Quality Permits Program, Air and Radiation Management Administration, 1800 Washington Boulevard Suite 720, Baltimore, Maryland 21230-1720. Further information may be obtained by calling Ms. Shannon Heafey at (410) 537-4433.

| Facility | Beginning | End |
|---|---|---|
| Charles County Landfill No. 2 | 08/01/08 | 08/31/08 |
| Forty West Landfill | 09/04/08 | 10/04/08 |
| Ingenco | 07/28/08 | 08/26/08 |
| Johns Hopkins Hospital | 07/31/08 | 08/31/08 |
| National Institutes of Health | 07/25/08 | 09/24/08 |
| Sandy Hill Landfill | 07/08/08 | 08/07/08 |
| Schmidt Baking | 06/05/08 | 07/05/08 |
| W. L. Gore | 05/28/08 | 06/26/08 |
| Washington County Hospital | 08/04/08 | 09/03/08 |

Petitions to EPA for Title V Permit Objections

| Facility | Last Day for Petition |
|---|---|
| National Institutes of Health | 11/02/08 |
| New Page (Luke/Westvaco) | 10/15/08 |
| Sandy Hill Landfill | 10/22/08 |
| Schmidt Baking | 09/26/08 |
| W. L. Gore | 09/26/08 |
| Washington County Hospital | 11/26/08 |

**Permit Resources**

*   Permit Guide
*   Download Permit Applications
*   Permitting Customer Survey
*   Permitting Assistance
*   Maryland Business Assistance Providers
*   Small Business Assistance
*   COMAR Online
*   Pollution Prevention
*   Part 70 Development White Paper
*   Part 70 Improvement White Paper



2

Attachment B



**TRC**

*Customer-Focused Solutions*

TRC Project No. 41434-0020-00004

January 2005

### FINAL REPORT

### Compliance Source Test
### of Particulate Emissions
### from Unit 4,
### Chalk Point Generating Station
### Aquasco, Maryland

Prepared for

Mirant Corporation
8711 Westphalia Road
Upper Marlboro, MD. 20772

Prepared by

TRC Environmental Corporation
Boott Mills South
116 John Street
Lowell, Massachusetts 01852
(978) 970-5600

### DISCLAIMER

This report is intended for use solely by Mirant Corporation for the specific purposes described in the contractual documents between TRC Environmental Corporation and Mirant Corporation. All professional services performed and reports generated by TRC have been prepared for Mirant Corporation's purposes as described in the contract. The information, statements and conclusions contained in the report have been prepared in accordance with the work statement and contract terms and conditions. The report may be subject to differing interpretations and/or may be misinterpreted by third persons or entities that were not involved in the investigative or consultation process. TRC Environmental Corporation therefore expressly disclaims any liability to persons other than Mirant Corporation who may use or rely upon this report in any way or for any purpose.

## 1.0    INTRODUCTION

### 1.1    OVERVIEW

TRC Environmental Corporation (TRC) of Lowell, Massachusetts was retained by Mirant to provide sampling and analytical support in completing the semi-annual Particulate Emission Compliance Test of Unit 4 at the Chalk Point Generating Station.

The Compliance Test Program at the Chalk Point Generating Station required emissions testing for particulate matter (PM) while operating at full load.

Sampling and analysis procedures described in this document were conducted using procedures deemed acceptable by the Maryland Department of the Environment (MDE) and the United States Environmental Protection Agency (USEPA). TRC was responsible for the collection and analysis of all flue gas samples.

### 1.2    SCOPE OF WORK

The test program approach involved conducting a series of three 1-hour test runs over the course of two days. Each test determined the emission rate of particulate matter in terms of the emission standard (grains/dscf@50% EA).

The required measurement parameters and EPA test methods to accomplish these objectives were:

- 40 CFR Part 60, Appendix A, EPA Methods

  - Methods 1 & 2 -      Velocity and Flow Rate
  - Method 3  -      Oxygen and Carbon Dioxide
  - Method 5 -      Particulate Matter

L2006-012.doc                                1

## 2.0    SUMMARY OF RESULTS

This section presents a summary of the particulate emissions testing conducted on Unit 4 at the Chalk Point Generating Station. The field sampling data sheets are located in Appendix A. The analytical data reports can be found in Appendix B. The analytical data reports can be found in Appendix C. The facility process data can be found in Appendix D and the equipment calibration forms can be found in Appendix E.

## 2.1    PARTICULATE MATTER

Three 1-hour test runs were conducted in accordance with EPA Method 5. Two runs were completed December 01, 2005 and one run was completed December 02, 2005. Table 2-1 presents the results for the three test runs. The average particulate concentration was found to be 0.0184dscf @ 50% EA, which is below the emission limit of 0.020 gr/dscf @ 50% EA.

### TABLE 2-1.   PM EMISSION SUMMARY FOR UNIT 4

| RUN | 1 | 2 | 3 | Average |
|---|---|---|---|---|
| Net Sampling Time, minutes | 60 | 60 | 60 | 60 |
| Particulate Catch, mg | 93.8 | 67.5 | 53.4 | 71.6 |
| Volume of Gas Collected, (dscf @ 77°F) | 54.544 | 54.702 | 53.332 | 54.193 |
| $CO_2$ Concentration, % dry | 12.2 | 12.1 | 11.9 | 12.1 |
| $O_2$ Concentration, % dry | 5.3 | 5.2 | 5.2 | 5.2 |
| Excess Air, % | 32.1 | 31.3 | 31.4 | 31.6 |
| Particulate Matter Grain Loading, gr/dscf @ 50% Excess Air | 0.0241 | 0.0172 | 0.0139 | 0.0184 |

Appendix D

Luke Paper Hazardous Air Pollutant Emissions
2002-2007

| 2007 | 1,059,313 |
|------|-----------|
| 2006 | 1,045,572 |
| 2005 | 1,181,103 |
| 2004 | 1,187,972 |
| 2003 | 965,962 |
| 2002 | 970,825 |

Source: U.S. Envtl. Prot. Agency, TRI Explorer, *available at* http://www.epa.gov/triexplorer/

23

Appendix B

Letter from Judith M. Katz to Jennifer Peterson Accepting Plaintiffs' Petition for
Objection to the Title V Federal Operating Permit Issued to Luke Paper Company, a
Subsidiary of New Page Corporation (Permit No. 24-001-00011)
(March 20, 2009)



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION III**
**1650 Arch Street**
**Philadelphia, Pennsylvania 19103-2029**

MAR 2 0 2009

Ms. Jennifer Peterson
Attorney, Environmental Integrity Project
1920 L Street NW, Suite 800
Washington, MD 20036

Dear Ms. Peterson:

The United States Environmental Protection Agency (EPA) has received your Petition to Object to issuance of a Title V operating permit, dated February 27, 2009, for the New Page Corporation Facility located in Luke, Maryland. In accordance with the procedures set forth in 40 CFR § 70.8, EPA is currently reviewing your request that EPA object to the issuance of a Title V operating permit to the above referenced facility.

EPA understands and appreciates your concerns regarding air quality issues in the State of Maryland. If you have any questions, please do not hesitate to contact Ms. Kathleen Anderson, of my staff, at 215-814-2173.

Sincerely,

Judith M. Katz, Director
Air Protection Division